Mitchell G. KING, et al., Plaintiffs,

Donald Pearson, et al., Intervenor Plaintiffs,

v.

Milton GREENBLATT, M.D., et al., Defendants.

Harold G. Williams, et al., Plaintiffs,

Sherman Miller, et al., Intervenor Plaintiffs,

v.

Michael Lesiak, et al., Defendants.

Nos. Civ.A. 72–788–ADM, Civ.A. 72–571–ADM.

United States District Court, D. Massachusetts.

June 21, 1999.

Peter F. Russell, Onset, MA, for Mitchell G. King, plaintiff.

Robert D. Keefe, Hale & Dorr, Boston, MA, for Class of 48+ 1, Harold Williams, James M. Kater, Thomas Minervino, plaintiffs.

David R. Geiger, Jeffrey S. Follett, Foley, Hoag & Eliot, Boston, MA, for Donald Pearson, Albert Gagne, Joseph Johnson, Lynwode Paquette, Calvin Tate, intervenor-plaintiff.

David R. Geiger, Jeffrey S. Follett, (See above), for Lynwode Paquette, intervenor-plaintiff.

Jeffrey S. Follett, Follett, Foley, Hoag & Eliot, Boston, MA, for Michael Kelley, Francis O'Connor, intervenor-plaintiff.

Judith S. Yogman, Attorney General's Office, Boston, MA, William L. Pardee, for Leslie Taylor, Correctional, Charles W. Gaughan, defendant.

Judith S. Yogman, Attorney General's Office, Boston, MA, for Milton Greenblatt, defendant.

Ronald J. DeWolfe, Bridgewater, MA, pro se.

Larry Davis, Bridgewater, MA, pro se.

Dennis J. Quintal, Sr., Bridgewater, MA, pro se.

Robert E. Cameron, Bridgewater, MA, pro se.

Peter T. Wechsler, John R. Hitt, Attorney General's Office, Boston, MA, for John F. White, interested party.

## MEMORANDUM AND ORDER

MAZZONE, District Judge.

These two cases involve a resident population of civilly-committed sexually dangerous persons at the Massachusetts Treatment Center for Sexually Dangerous Persons in Bridgewater, Massachusetts (the "Treatment Center"). They enter their final stage on the defendants' renewed motion to vacate or terminate long-standing consent decrees which were put in place approximately twenty-five years ago to govern operations at the facility. The road to this point has been long and uneven. The twenty-seven years of litigation along the route has been exhaustively described in prior orders of this Court and the Court of Appeals, but a brief overall review may be a helpful backdrop to this memorandum.[1]

The Massachusetts Sexually Dangerous Person Law was passed in 1947, Statute 1947, c. 683, and is found at Mass.Gen. Laws ch. 123A § 1 et seq. It was premised on the assumption that sex offending was caused by severe mental illness which could be cured if the offender was given a day to life commitment at a psychiatric institution to participate in an intensive treatment regimen.[2] The statute was amended in 1954 to provide for the establishment of a such a facility. The Treatment Center subsequently opened in 1957 to serve this population.

In 1972, residents at the Treatment Center filed complaints alleging that the conditions of confinement and the inadequacy of treatment programs, work opportunities, and avocational and educational activities, violated the fifth, eighth, and fourteenth amendments to the U.S. Constitution.[3] In 1974, the district court entered

---

**1.** See King v. Greenblatt, 149 F.3d 9 (1st Cir. 1998); King v. Greenblatt, 127 F.3d 190 (1st Cir.1997); In Re Pearson, 990 F.2d 653 (1st Cir.1993); Pearson v. Fair, 935 F.2d 401 (1st Cir.1991); Pearson v. Fair, No. 81–3219 (D.Mass.1989); Langton v. Johnston, 928 F.2d 1206 (1st Cir.1991); Williams v. Lesiak, 822 F.2d 1223 (1st Cir.1987); Pearson v. Fair, 808 F.2d 163 (1st Cir.1986).

**2.** Mass.Gen.Laws ch. 123A § 9 provides for a periodic review of a civilly-committed resident's sexual dangerousness in the form of a

hearing. Upon a determination that an individual is no longer sexually dangerous, he is returned to a correctional institution to complete his criminal sentence, or, where he has not received a criminal sentence, or has completed it, he is released to the public.

**3.** Mitchell King was a Treatment Center resident who alleged that his constitutional rights had been violated by being placed in solitary confinement, a six by nine foot filthy cell with no toilet, sink, drinking water, visits, nor reading material without giving him notice

two consent decrees in *King* (the "Original" decree, and one week later, the "Supplemental" decree) and one consent decree in *Williams.* (It also issued a partial consent decree in 1975 which elaborated on one provision of the *Williams* decree.) The consent decrees have raised a variety of issues and have led to a stream of litigation over the course of their twenty-five year history.

In order to fully evaluate the impact of this litigation, it is important to understand the basis on which these cases were brought and the issues that confronted Judge Wyzanski at the time these decrees were entered. While the later years of litigation tended to focus on specific issues raised in *King* and *Williams,* such as inadequacy of treatment and unfair denial of privileges, the full record before Judge Wyzanski went far beyond the claims in those cases. At the time the consent decrees were entered, conditions at the Treatment Center were deplorable.[4] Residents lived in cramped, poorly furnished cells which were built in 1895. Their water supply came from the highly polluted and inadequately treated Taunton River. At various times in 1972, 1973, and 1974, the bacterial level of the river water after chlorination failed to meet safe drinking water standards. Even the portable water supply from wells was exposed to danger of pollution from a nearby dump. Moreover, it was continually interrupted due to the Center's antiquated plumbing system which dated back to 1888. The Center's sewerage system was similarly outmoded and sub-standard, having had no work done on it since 1934. The cells were without toilets or sinks. Instead, residents were forced to keep small chamber pots in their cells in which to defecate and urinate. Every morning residents lined up and carried their human waste to empty into a service sink at the end of their floor. The service sink was located within a few feet of a large cast iron trough used for washing. Washing and shaving took place in open view of urinating and defecating activities. The shower facility was located outside the housing unit, across an outdoor courtyard. Thus, residents seeking to shower were forced to walk outside, even during the cold winter months. Heating and ventilation equipment was obsolete, and some cells were without heat for periods of several days. There was only one licensed doctor at the Treatment Center and no nurses. Medication was handed out by correctional officers. There was no library, no educational programs, no gymnasium, no outdoor recreation area, and no work-release or community access program. Vocational facilities were very limited. Nor was there any tier-system of security. Instead, all residents were housed under maximum security conditions. Movement was restricted as correctional officers on patrol did not carry cell keys. All keys were kept in one location and each cell had to be opened individually. These were the conditions that existed at the time of the consent decrees. They are representative of the circumstances that the consent decrees aimed to correct.

The first five provisions of the Original *King* and *Williams* consent decrees contained parallel language which provided that the Treatment Center would be treated as a Department of Mental Health ("DMH") facility. DMH was granted pri-

and an opportunity to be heard, for calling a guard a "dingbat". Harold Williams, another resident, alleged that his due process rights were violated by the inadequacy of treatment provided at the Treatment Center, specifically by deficiencies in job training, work programs, and education.

4. On November 5, 1974, counsel for the plaintiffs and the Commonwealth submitted Stipulations of Fact concerning the Treatment Center which were accepted by Judge Wyzanski. These stipulations provide the basis of the consent decrees and describe in great detail the conditions which the decrees were meant to correct. The record does not reflect any other basis for the entry of the consent decrees; that is, there are no transcribed records of any hearings or court memoranda to describe the conditions at the Treatment Center.

mary authority over residents and treatment, while the Department of Corrections ("DOC") was given responsibility for custodial personnel.[5] Residents were entitled to "the least restrictive conditions necessary to achieve the purpose of commitment." Both DMH and DOC would "take steps jointly" to "improve physical conditions," "implement a meaningful work program," and have "a system of differing security for different categories of patients ... to permit less restrictive conditions for those patients not requiring maximum security." The Supplemental Decree addressed King's specific complaint over his placement in the segregation unit. It prohibited the use of solitary confinement "for the purpose of discipline or punishment" and required that any sequestering conform with the "minimum standards of due process" and "human decency." The *Williams* Decree further ordered the defendants to submit a plan to offer therapeutic, educational, vocational, and avocational programs at the Treatment Center and a provision for a day or other short-term release to allow residents to participate in approved programs outside of the facility.

Over the ensuing years, the consent decrees led to gradual and steady improvements in the general circumstances of confinement and the provision of treatment, as well as to the physical conditions of the facility. As the First Circuit remarked, the course of this litigation "has accomplished much in a troubled and complex field of custody and treatment of institutionalized sexually dangerous persons. During this period, changes have occurred in conditions of confinement and treatment, in the problems confronted, and in the institutional setting." *King v. Greenblatt*, 149 F.3d at 12 (1st Cir.1998). Residents are now housed in a modern facility and live under conditions which are vastly different from those that residents such as King and Williams were subject to in 1972.[6] There are a wide-range of therapeutic, educational, vocational and avocational activities available to residents, as compared to what was in place when the complaints were brought. Moreover, there are work opportunities available to residents at the Center and a program in place which allows residents to gradually re-enter the community outside the facility.

While it is generally acknowledged that physical conditions at the Treatment Center improved dramatically since 1972, along with the kinds of treatment, programming and work opportunities, the facility was never free from the tension that existed as a result of its shared control by DMH and DOC. That tension contributed to years of litigation centered around the inevitable conflicts that arose from the dual management of a hybrid facility whose purpose was to provide effective treatment, for which DMH was responsible, in a secure setting, for which DOC was responsible. " 'The stream of litigation occasionally overflowed the district court' *Pearson III*, 990 F.2d at 655, and this court as well." *King v. Greenblatt*, 52 F.3d 1, 3 (1st Cir.1995).

Following the *Pearson* and *Langton* trials,[7] I heralded my concern that the court would face many more years of litigation

---

**5.** These provisions reflected the language of then Mass.Gen.Laws ch. 123A, § 2.

**6.** For example, the Minimum Privilege Unit rooms, once the subject of King's complaint, now measure eight by sixteen feet and are equipped with toilets and sinks. Residents in those rooms have access to the telephone, library materials, canteen, exercise periods, visitors and treatment.

**7.** Plaintiffs in both cases sought enforcement of the consent decrees and civil contempt for defendants' alleged violations of the terms of the decrees. The *Pearson* case challenged the use of sequestration and the *Langton* case challenged the adequacy of treatment. After successive trials in the spring of 1989, I dismissed both complaints. At that time, I left the *King* case open, viewing it as the appropriate vehicle within which to resolve complaints about operations at the Treatment Center.

unless some effort was made to address the conflicts and ambiguities raised by the dual agency control of this unique institution. In addition to the discreet claims made in those and other cases, there was ongoing discussion surrounding proposed legislation to abolish the civil commitment statute. In 1988, the Legislature authorized a review of ch. 123A and the Treatment Center as part of a broad-based study of the Commonwealth's forensic mental health system. The reviewing panel concluded that the mental health approach to sex offender treatment was no longer effective because sexual violence is primarily a form of anti-social behavior which can be controlled, but not "cured." It advocated that the mental health approach be abandoned for a treatment program based more upon cognitive behavioral models. It recommended that the civil commitment statute be abolished.[8] It also recommended that DOC develop a program for voluntary sex offender treatment in the prisons. In 1990, civil commitments were abolished. Shortly thereafter, discussion began about vesting control of the Treatment Center solely in DOC. To consider the ramifications of the existing and pending legislation relating to sexually dangerous persons, and acting on my own initiative, I appointed a Special Master on September 2, 1992, with very specific directions. That order survived a petition for mandamus. *See In Re Pearson*, 990 F.2d 653 (1st Cir.1993).

At this time there was legislation pending which greatly altered the structure and operation of the Treatment Center by transferring jurisdiction of the Treatment Center from the dual control of DMH and DOC to the sole control of DOC and adding "custody" to the statutory goals of "care, treatment, and rehabilitation" of civilly-committed sexually dangerous persons. This legislation was eventually enacted as 1993 Mass.Acts. ch. 489, which amended Mass.Gen.Laws ch. 123A. The amended statute was a significant development for several reasons. First, it shifted complete control of the facility to DOC. Second, the consent decrees provided that residents were entitled to the "least restrictive means necessary to achieve the purposes of commitment." Thus, with the enactment of ch. 489 came a recognition that one of the purposes of civil-commitment was custody. It also brought with it defendants' first motion to vacate, or in the alternative, to modify the consent decrees to conform them to the statutory change.

The ensuing period of time was marked by several fits and starts regarding modifications of the consent decrees.[9] On March 11, 1994, I appointed counsel for a class of residents naming themselves the Class of 48 + 1 who alleged additional violations at the facility.[10] On May 27, 1994, in light of the new legislation and the transfer of control to DOC, I reopened the *Williams* case and consolidated it with *King*.[11] At the same time, I denied the motion to modify, finding that DOC had not presented the Court with any information demonstrating its ability to provide treatment in compliance with the consent decrees. I invited DOC to provide specific details in

8. See Final Report of the Governor's Special Advisory Panel on Forensic Mental Health, September 1989. Repeal of the statute had also been recommended by the American Bar Association in its 1984 proposed Criminal Justice Mental Health Standards, citing a report by the American Psychiatry Association which stated that mental disability was no longer considered the underlying basis of sexual offenses.

9. That history is chronicled in *King v. Greenblatt*, 52 F.3d 1 (1st Cir.1995) and *King v. Greenblatt*, 127 F.3d 190 (1st Cir.1997).

10. I received a letter from forty-eight residents complaining about conditions at the Treatment Center and treated it as a pro se complaint.

11. Because *Williams* focused on treatment issues and programs, I appointed separate counsel for the *Williams* plaintiffs on April 17, 1995.

the form of a plan of how it proposed to operate the facility. The transfer of control of the Treatment Center to DOC marked a critical juncture in the history of the facility. Given the cessation of civil commitments, the legislative amendments, and changes in the treatment philosophy during this period, there was significant concern about how DOC would ensure treatment for a slowly diminishing resident population. Against this backdrop, DOC developed a plan for the management and administration of the Treatment Center ("Plan") in an effort to demonstrate how it would fulfill its new responsibilities. DOC filed this Plan with the Court for approval on September 26, 1994. On July 31, 1995, I stayed the implementation of central components of the Plan and directed the parties to attempt to reach a consensus on these issues.

This period was also marked by the construction of a 300–bed modular unit on the grounds of the Treatment Center to house 300 convicted sex offenders who were participating in the DOC's sex offender treatment program. Clearly, this event held promise for disruption and, indeed, remains at this time, the greatest challenge to DOC's management of the Center. The influx of DOC inmates required the integration of the Treatment Center with the prison program for sex offenders. DOC submitted a plan detailing how it would accommodate the influx of inmates to the facility while maintaining its obligations under the statute to keep civilly-committed residents separate and apart. *See* "Massachusetts Treatment Center Management Plan To Accommodate 300 New State Prison Inmates, August 2, 1996." Persuaded that the Treatment Center's program would remain the same, that is, remedial, and that DOC's plan provided priority to residents over inmates whenever possible and feasible, I denied the motion to enjoin the construction of the units. *King v. Greenblatt,* No.

72–788, (D.Mass. September 30, 1996).[12] Finally, during this period of an emerging Plan and a changing legislative and political landscape, the parties were repeatedly urged, with the assistance of the Special Master, to confer and reach agreement on the rules and regulations which would henceforth govern the Treatment Center. Unfortunately, those efforts were unavailing.

Eventually, the legislative enactments and changes in the approach to the treatment of sexually dangerous persons necessitated modifications to the decrees. On October 31, 1996, after a careful scrutiny of the Plan, I granted the Commonwealth's motion to modify the decrees. *King v. Greenblatt,* No. 72–788, slip op. (D.Mass. October 31, 1996). The one hundred and thirty-six page Plan set forth in great detail the policies and procedures DOC would follow in operating the Center. I found that the Plan was "a permissible and detailed proposal" and that the goals of treatment and security and protection of residents' rights were met. *Id.* at 55. However, I directed DOC to submit an updated amended plan that addressed certain concerns the parties had raised. An Amended Plan was filed on November 29, 1996. It is that Plan, together with the policies and procedures implemented under that Plan, which are the governing documents for the Treatment Center.

While I allowed the Commonwealth's motion to modify, I denied the Commonwealth's contemporaneous motion to vacate the consent decrees without prejudice to renew in one year. During this time, I would evaluate and monitor DOC's implementation of the Plan because what remained to be seen following modification was DOC's willingness and commitment to accomplish the stated goals. In order to provide DOC with the opportunity to demonstrate its commitment to providing effective treatment in a secure setting, I required the Commonwealth to file month-

---

12. A similar effort to enjoin the placement of 48 sentenced sex offenders was also rebuffed in state court. *Miller v. DuBois,* No. 97–P–138 (Mass.App.Ct. June 3, 1998).

ly reports, providing statistics on population, treatment programs, attendance, transfers, community access and other pertinent information. I received 15 monthly reports. The plaintiffs filed an initial response which generally assailed the reports as unverifiable, predictably self-serving and unreliable as evidence, since no discovery had been allowed. Some later responses included affidavits and submissions contradicting the information contained in the monthly reports.[13] During this time, I continued to receive letters from residents voicing their observations, complaints and concerns about DOC's management of the Treatment Center. A great many of their comments centered on the presence of the 360 DOC inmates.[14] In addition, I made several visits to the Treatment Center with counsel to meet with the Superintendent and JRI and DOC staff members. I scheduled one visit to the Center for the specific purpose of hearing the views of the residents who were identified by counsel as witnesses. This was all done in an effort to review DOC's willingness and ability to satisfy its statutory obligations and its responsibilities under the consent decrees. The order was appealed.

On July 7, 1998, the Court of Appeals affirmed my order granting the Commonwealth's motion to modify the decrees. *King v. Greenblatt*, 149 F.3d 9 (1st Cir. 1998). I believe that opinion provides valuable guidance, especially with respect to specific areas of extensive comment and its assessment of due process concerns in the disciplinary procedure.

Turning to the modified decrees, in the words of Judge Coffin, "the substantive essence" of the Original *King* and *Williams* decrees is the provision that "patients at the Treatment Center should have the least restrictive conditions necessary to achieve the purposes of commitment." *King*, 149 F.3d at 15. The remaining provisions require the following: (1) DOC should "improve the physical plant" with particular reference to toilet facilities, heating systems, and space; (2) DOC should have a "system of differing security for different categories" of residents; and (3) DOC should "implement a meaningful work program and increase avocational activities." For the first time in the history of this litigation, the decrees were modified to permit DOC to use sequestration for the purpose of discipline or punishment. This was done by striking the statement from the Supplemental Decree which said that disciplinary and punitive procedures had "no place in the care and treatment of civilly committed patients" and replacing it with a prohibition against the use of sequestration as punishment for the acts underlying a resident's civil commitment. The Supplemental Decree, as modified, (1) prohibits DOC from using solitary confinement "for the purpose of punishing residents for the acts underlying their commitment," and (2) requires that any sequestering or segregation of residents conform to "minimum standards of procedural due process" and "human decency."

Following that opinion, the Commonwealth filed the renewed motion to vacate or terminate the consent decrees which is now before me. The plaintiffs and intervenor plaintiffs filed their opposition, a joint status report on conditions at the Center, a motion for corrective action and requests for discovery.

Since November 29, 1996, the date on which the amended Plan was filed with this court, the question has been whether DOC has administered the Plan in harmony with the essence of the modified con-

---

13. As I have said before, the purpose of the monthly reports was not to make findings, but to observe DOC's ability to implement the treatment program established in the Plan. *See King v. Greenblatt*, No. 72–788, slip op. at 16 (D.Mass, December 29, 1997).

14. In the Spring of 1995, DOC moved 60 inmates who were participating in the intensive treatment phase (Phase IV) of the DOC sex offender treatment program from the Southeastern Correctional Center to the Treatment Center's D–2 unit.

sent decrees, that is, whether DOC has insured that patients are subject to the least restrictive conditions necessary to achieve the purposes of commitment. The defendants contend that the original conditions underlying the consent decrees no longer exist and that they have administered the Plan in accordance with the meaning of the consent decrees. They further suggest that DOC's record in its administration of the Treatment Center demonstrates that there is little or no likelihood that the original constitutional violations will return once the decree is lifted. *Inmates of Suffolk County Jail v. Rufo,* 12 F.3d 286, 292, (1st Cir.1993), citing *Board of Educ. v. Dowell,* 498 U.S. 237, 247, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991).[15] The plaintiffs' opposition alleges that DOC has failed to show that the underlying constitutional wrongs have been remedied, has failed to comply with the decrees in good faith for a reasonable period of time, and has failed to demonstrate a willingness and commitment to provide treatment in a secure setting. Plaintiffs sought discovery to test defendants' claims. On January 14, 1999, I granted plaintiffs' request for discovery.[16] Following discovery, the matter was set for evidentiary hearing on March 16, 1999. At the hearing, I took the testimony of seventeen witnesses, including residents, the plaintiffs' expert, and JRI and DOC officials. One day of hearing took place at the Treatment Center and ten residents testified. The testimony was supplemented by affidavits from residents and counter-affidavits from the Commonwealth. Sixty-three exhibits were introduced. The evidence adduced at the hearing, plus the full record of these cases since 1972, comprise the basis of my conclusions.

15. The defendants also claim that the Prisoner Litigation Reform Act, 18 U.S.C. § 3626, amended by Pub.L. No. 105–119, § 123(a)(2), 111 Stat. 2440, 2470 (1997), mandates termination, a claim I address later in this memorandum.

16. The plaintiffs originally requested discovery going back to 1972, a request I considered

## II.

As Judge Selya said, speaking for the First Circuit in an earlier case in this litigation, when "an injunction entered pursuant to a consent decree has ongoing effects, the issuing court retains authority to enforce it ... [and] to modify or interpret such decrees in light of changed circumstances." *In Re Pearson,* 990 F.2d 653, 657 (1st Cir.1993), citing *United States v. Swift & Co.,* 286 U.S. 106, 114–15, 52 S.Ct. 460, 462–63, 76 L.Ed. 999 (1932). For nearly twenty-five years, six judges of this court have been called upon to interpret, enforce, and recently, to modify these decrees.

I repeat the standard to be applied in this case. It is derived from the standard used by courts when deciding whether to end injunctive orders in school desegregation cases. *See Board of Educ. v. Dowell,* 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991), and more recently, *Freeman v. Pitts,* 503 U.S. 467, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992). The First Circuit has relied on this standard in cases involving consent decrees which pertain to conditions at correctional facilities, *Inmates of Suffolk County v. Rufo,* 12 F.3d 286 (1st Cir.1993), *In Re Pearson,* 990 F.2d 653 (1st Cir.1993); and to the treatment of mentally ill persons, *Consumer Advisory Bd. v. Glover,* 989 F.2d 65 (1st Cir.1993).

Under *Dowell,* I must determine that the underlying constitutional wrong has been remedied and that the authorities have complied with the decrees in good faith for a reasonable period of time since they were entered. *Dowell,* 498 U.S. at 247, 249–50, 111 S.Ct. 630. In *Rufo,* the

unnecessary and duplicative given the full record developed over the past twenty-seven years. However, since plaintiffs responses to the monthly reports showed clearly their skepticism of DOC's ability to manage the Treatment Center, I granted discovery but limited it to the relevant period since DOC assumed control of the facility.

First Circuit said that the district court must be satisfied that there is little or no likelihood that the original constitutional violations will return when the decree is lifted. *Rufo*, 12 F.3d at 292, citing *Dowell*, 498 U.S. at 247, 111 S.Ct. 630. This Circuit also said that the district court may consider the defendants' past record of compliance; present attitudes towards the reforms mandated by the decrees; and the way in which demographic, economic, and political forces may be expected to influence local authorities and the institution once the shelter of the decrees has been lost. *Id.*

At first reading, the standards appear to require a straightforward application of the law to the factual record. But, as usual in the context of the unique and changing environment of the Treatment Center, the application is not so straightforward. If the issue is whether the consent decrees are necessary to correct the conditions that existed at the Treatment Center at the time the decrees were entered, and continue to be necessary to maintain the improved conditions so that the constitutional rights asserted in *King* and *Williams* are not violated, I conclude that the evidence clearly shows that the consent decrees have served the purpose of correcting those conditions and are no longer necessary to maintain those improvements.

On the other hand, if the issue is whether the consent decrees continue to be necessary because of concerns that once the shelter of the decrees has been lost, "the original constitutional violations will promptly be repeated," then the test becomes one of the sincerity, willingness and commitment of DOC to the Treatment Center's mission. The resolution of this issue requires an examination of DOC's past record, its attitude toward treatment and behavior management, and the influ-

ence of outside forces. With these issues in mind, I turn to the record.

### III.

■ First, to understand the challenges that face DOC in the future, we consider a decreasing population in view of the physical layout of the Treatment Center. There are currently 177 civilly-committed residents at the facility. Eleven of these individuals are referred to as "straight civil", that is they are residents who never received a criminal sentence or who were civilly-committed in lieu of receiving a criminal sentence. Eighty-nine individuals are residents who have completed their criminal sentence but remain civilly-committed. The remaining seventy-seven residents are still serving a criminal sentence.

The Treatment Center is comprised of 4 units, A, B, C, and D. Each unit contains 54 cells, 30 in one section and 24 in the other. The cells front on a common area. The maximum capacity of the Treatment Center, single-bunked then, is 216.[17] Section D–2 is occupied by the 60 Phase IV DOC inmates, who are double-bunked in 30 cells. The remaining 186 cells are available for the residents or civils who are not at the Transition House or in the Minimum Privilege Unit. At this writing, there are approximately 14 empty cells at the Center. More empty cells are anticipated as Section 9 trials are scheduled in the next four months, creating the possibility that more residents may be released from the Center.

This decline in resident population was foreseen by the Massachusetts Legislature. Chapter 150, of St.1990, Section 104 provides that the Commissioner of Correction may utilize available space at the Treatment Center to address overcrowding at other facilities, provided that the Treatment Center residents remain separate and apart from DOC inmates.[18] The

---

17. There are also rooms available to residents in the Transition House. Currently five residents reside in the Transition House.

18. This also reflects the understanding articulated in *Commonwealth v. Page*, 339 Mass. 313, 159 N.E.2d 82 (1959). In that case, the SJC required the release of a civilly-commit-

prospect of housing additional DOC inmates at the Treatment Center, invites the further question of whether the consent decrees are a necessary restraint; a cautionary reminder to DOC that its operation of the Treatment Center, particularly with regard to the separation of the civils, will never be immune from scrutiny. At this point, the record shows that DOC has developed a system of priorities and internal controls that allows it to integrate treatment services for Treatment Center residents and DOC inmates and provide the best current treatment methodology to both populations.

A critical part of the Plan provides for the continuation of the same clinical treatment program which was previously provided under DMH. In 1992, long before DOC assumed control, DMH contracted with the Justice Resource Institute ("JRI") to administer the treatment program at the Center. JRI developed a new treatment program for the Center which replaced the mental health model with one based upon expanded cognitive behavioral methodologies.[19] The initial contract expired in October 1997, at which point DOC renewed the contract for another five years.

Dr. Barbara Schwartz is the Clinical Director of JRI. She has specialized in sex offender treatment and has worked to develop sex offender treatment programs around the country. She has directed the program at the Treatment Center since JRI received the contract in 1992. Thus, she has had experience providing sex offender treatment under both DMH and DOC regimes. As Clinical Director, Dr. Schwartz has overall responsibility for the therapy provided to civilly-committed residents at the Center, as well as to inmates in various DOC facilities throughout the Commonwealth which offer sex offender treatment. Her responsibilities at the Center include meeting weekly with JRI and DOC management staff and representatives of the Treatment Advisory Board on treatment issues, and being available to listen to residents' concerns at Tuesday and Thursday "Happy Hour" sessions.[20] Spending approximately 28 hours a week at the Center, she has an opportunity to observe the policies and practices of Treatment Center staff as well as the participation and progress of residents in treatment. Having worked at the Treatment Center from when it was a DMH facility through to its present day existence as a DOC-operated facility, Dr. Schwartz has been well-situated to observe the effect that the changes in legislation and circumstances have had on the provision of treatment in a secure setting.

Dr. Schwartz' testimony is largely corroborated by her associates at JRI, Dr. John Cusack, JRI Director of Programs, and Mr. Gregory Canfield, Director of Justice Programs. Both individuals come with extensive experience and, I believe, an understanding of their responsibilities in this unique institution. Dr. Cusack spends thirty-five to forty-two hours a week at the Treatment Center meeting with staff members and residents and attending Happy Hour one or two times per month. Mr. Canfield has worked at the Treatment Center in programs for twelve years. As Director of the Justice Pro-

ted person because the facility did not constitute a valid Treatment Center under Mass. Gen.Laws ch. 123A where he was housed with the general prison population and was not provided with separate sex offender treatment because the only treatment then available was the therapy available to the total prison population.

**19.** See William D. Pithers, Ph.D., *Technical Assistance Report: Massachusetts Department of Correction,* June 8, 1994 at 15.

**20.** According to Dr. Schwartz, Happy Hour was instituted when DOC assumed control of the Treatment Center. Happy Hour is a practice common to many security programs. It consists of Treatment Center staff making themselves available outside the dining hall two times a week to listen to residents and speak to them about their concerns.

gram, Canfield's primary responsibility is supervising JRI's contract with DOC and attending Treatment Center management meetings. He has witnessed and participated in the operation of the Treatment Center from its incarnation as a DMH facility through its transition to a solely DOC-run institution. All three JRI personnel testified at the hearing about a variety of issues having to do with the operation of the Treatment Center and the provision of treatment to residents.

Turning to the testimony of DOC officials, it covered the areas of psychological services and the community access committee, classification, and programs and the overall responsibility of the Superintendent.[21] It could fairly be described as predictably positive, but there is ample objective evidence to support their testimony. In addition to the testimony of JRI officials, DOC's internal inspections of the Treatment Center's compliance with established policies and procedures has been acceptable. Sanitary inspections by the Department of Public Health show no deficiencies. Nationally, the Center has been identified as a "monitoring site" by the Center for Sex Offender Management and it has received the accreditation of the American Correctional Association.[22]

One of the most prominent subjects of discussion by both plaintiffs and defendants in these cases surrounds the imposition of discipline at the Center. When Dr.

Schwartz began work at the Center, she was surprised to learn that there were no written rules regarding discipline and that discipline was handled informally with sanctions determined on an *ad hoc* basis by DMH staff. According to Dr. Schwartz, a disciplinary system, which utilizes sequestration as a form of punishment, is a necessary and integral part of any treatment program. She, therefore, supported the implementation of a clear set of rules with consequences and expectations of sanctions as a means of helping residents better adjust to their community upon release. She then drafted a disciplinary policy which was based upon a number of prison policies and included a list of defined offenses and corresponding sanctions. DOC eventually adopted this policy.[23]

According to the policy, there is a code of offenses divided into four categories of severity with corresponding sanctions, which extend from an unwritten warning up to a thirty-day placement in the MPU. A staff member who observes a resident committing an offense completes an Observation of Behavior Report (OBR). The OBR is then reviewed at the resident's hearing before the Behavior Review Committee (BRC). The BRC is a three-member board consisting of one security staff member, one clinician, and one JRI staff member, who are all appointed by the

**21.** Testimony was taken from Marie King, Director of Forensic Psychological Services and Chair of the Community Access Center; Joseph Murphy, Director of Classification and Programs; Superintendent Robert Murphy; and Deputy Superintendent Patricia Spitaro. Deputy Superintendent Spitaro left DOC shortly after this hearing.

**22.** The accreditation by the American Correctional Association ("ACA") was derided by plaintiffs in their response to DOC's first monthly report as inapplicable because the ACA was not qualified to deal with "mental institutions", a classification of the Treatment Center which has been asserted repeatedly by the plaintiffs, and which, I believe is mistaken. *See King,* 149 F.3d at 18 for the First Circuit's discussion regarding the application

of *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) to this case.

**23.** See 103 CMR 431.0 "It is a basic tenet of sex offender treatment that sex offenders are responsible for their behavior and that they are responsible for knowing and conforming to laws set down by society. To further the goals of a cognitive behavioral treatment program while ensuring fairness to all residents, 103 CMR 431.0 institutes a clear set of rules linked to a clear set of sanctions, which could be modified according to mitigating or aggravating circumstances." Included in the policy is a provision which allows a resident to be placed in MPU while pending a hearing or the completion of an investigation or while awaiting transfer to another facility.

Superintendent. The BRC's responsibility is to review alleged offenses and determine any sanctions. In addition, the Superintendent is authorized to impose sequestration while a resident is awaiting a hearing and while investigation of an offense is pending where the resident has threatened, attempted, or inflicted serious harm to others. At the hearing, residents are allowed to present evidence and call and cross-examine witnesses.

Similarly, Mr. Canfield testified that the disciplinary policies were appropriate from a treatment and programming perspective. He specifically addressed the privilege system in place at the Center. This system consists of three levels of privilege, minimum, moderate, and maximum. Those residents assigned minimum status are allowed a microwave; those with moderate status are permitted extra movies, room visits within a resident's own unit, and approved arts and crafts in their rooms; maximum status residents are allowed all of those privileges in addition to periodic special meals in the dining room. There are ongoing discussions about what will be allowed under the three levels. Privilege criteria and status are reviewed by the Administrative Team at the Bi–Annual Review of Treatment (BART). Canfield acknowledged differences between what existed when DMH was in control and what exists now under DOC's system. For example, under DMH's regime, residents were allowed to keep more property in their rooms. However, he says, an effort is made to ensure that residents have equal access to the highest level they are capable of achieving as determined by their Unit Team.

I have already found that the disciplinary policy contained in the Plan "gives adequate and fair warning of punishable offenses and their corresponding sanctions,

and provides for notice and a hearing, where the resident has an opportunity to be heard." *King v. Greenblatt*, No. 72–788 slip op. at 17–18 (D.Mass. December 29, 1997) Similarly, the First Circuit has already reviewed the policy and determined that "the disciplinary system is responsive to both the 'treatment' need of residents to learn accountability for their actions and the administrative and security concerns of the institution." *King*, 149 F.3d at 18. Moreover, the Court of Appeals found no constitutional defects in the disciplinary procedures set forth in the Plan. According to Dr. Schwartz, the new disciplinary plan continues to be positive and she is satisfied with the current policy as it relates to treatment. She notes the reaction of many residents who say it is much fairer to have a clearly established set of rules to understand and to follow.

In discussing the relationship between discipline and therapy, a significant amount of testimony focused on the impact of the Minimum Privilege Unit ("MPU") on the lives of residents at the Center.[24] While in MPU, a resident cannot participate in primary group therapy or attend psycho-educational classes, specialty groups, or avocational/educational classes. However, therapists are available to provide residents in MPU with an opportunity for individual consultation.[25] Residents are also entitled to telephone access, the right to receive visitors, as well as access to exercise, library materials and showers. According to Dr. Schwartz, DOC has made changes to MPU procedures which have been positive from a treatment perspective. For instance, DOC has changed the policy to ensure that residents who are sent to MPU are relieved of the long wait of having to go before the Treatment Directors Board ("TDB") for review of their placement. The result is that it takes less

---

**24.** The MPU is used to sequester residents for reasons set forth definitively in the Plan.

**25.** 103 MTC 423.07 provides that residents in the MPU will be provided treatment by their regular treatment team unless some modifica-

tion is dictated by safety and security. They also receive a physical and mental assessment conducted by a qualified health professional upon entry to the MPU.

time for a resident to work his way through MPU. She says the previous policy was inherently unfair because the TDB met only once a week and any resident who was sent to MPU was often forced to wait a week for the TDB to reconvene. Having reviewed the MPU procedures, the Court of Appeals has already concluded that MPU is "an integral part of the Plan's system of graduated and defined offenses and sanctions" and that "the Plan preserves clinical treatment programs and procedural safeguards ... [and seems] well within reasonable requirements." *King*, 149 F.3d at 21, 22.

As to treatment issues, therapeutic activities have been expanded and specialized. The primary components of the treatment program at the Center are primary groups, specialty groups, and psychoeducational classes.

The current therapy participation rate is 65 – 68%. Dr. Schwartz would like to see more residents active in therapy. Socially-inactive, underdeveloped, or cognitively-impaired residents are separated into different units for both security and therapeutic reasons. Therapies are then tailored to each particular group. While Dr. Schwartz attested to her satisfaction with the treatment program and DOC's response to some of her concerns, she did not conceal her other concerns. She has submitted a plan to DOC on a program designed to encourage those who do not participate in the various therapies and classes to become more comfortable in those social interactions and to participate in treatment.

Each term JRI publishes a roster of all of the classes which are offered for that particular quarter. The psycho-educational classes currently offered to residents include Relapse Prevention; Addictions and Recovery; Family Dynamics; Anger Management; Men's Work; Drama Therapy; writing Behavioral Treatment Scripts; Creating Change; Domestic Violence; and Gender Differences. However, inmates who are participating in DOC's intensive Phase IV program receive priority for Addictions and Recovery and Creating Change classes. In a few instances, not all of the classes offered were listed on the roster form because they were instituted after the roster list was published. Residents and inmates sometimes take classes together. Residents receive priority for classes taught by JRI staff.[26] Dr. Schwartz says that if residents were ever prevented from taking a course because of the number of inmates who signed up, then another class was opened to accommodate them. There was one instance where inmates were enrolled in the "Negotiating Conflict" class and residents were left on a waitlist. According to Dr. Cusack this was an oversight and residents should have received priority. In addition, there was testimony about the fact that residents are sometimes required to retake courses. For example, a resident who receives an OBR, may have to retake a course such as "Anger Management." Also, residents may have to retake a relapse prevention course if a length of time has passed since they originally passed it.

Another integral aspect of the treatment provided at the Center is the avocational and educational classes offered to residents. JRI and DOC staff agree that such offerings are important to a meaningful treatment program. Avocational/educational programs offered to residents at the Treatment Center include instruction in basic skills; special education courses; general equivalency degree courses ("G.E.D."); and courses in general interest. This past winter there were 47 classes offered, including classes in math (pre-G.E.D., G.E.D., and pre-college); so-

---

**26.** On the top of the "Roster of Psychoeducational Classes for Winter 1999", (Ex. 8), its states "All SDP/Civil Residents have first and last choice of any class offered by SDP staff." Also, the *Inmate Orientation Handbook*, (Ex. 53), which is provided to every inmate, states on Page 28, that "Civil commitments have priority during sign-ups of educational courses, library space, and recreation."

cial studies; history; current events; science; language; reading; African American Culture; English for non-English speakers; French; Spanish; Computer Skills; Music; Journalism; Health and Nutrition; sewing; Job Skills; Woodshop; Culinary Arts; Strengthening the Family Unit; Creative Problem Solving; Social Skills; Survival Skills/Relapse Prevention; and Open Art Room.[27] These classes meet either once or twice a week. For a period of time during the transition from dual agency control to DOC control, aspects of the avocational/educational program were shut down. The program is now back up and running and the number of classes being offered is increasing.

A work program is similarly important to a sex offender treatment program. The work program at the Treatment Center offers residents and inmates a variety of jobs which are compensated according to a tiered wage system that pays $1.00, $1.50 or $2.00 per day. There are also some special rate jobs which are funded by vendors. Approximately 121 residents have jobs at the Center.

Job assignments and priorities were a constant complaint reflected in the residents' testimony, but there is a process in place which gives residents priority for certain jobs. Residents are placed in jobs by the DOC Assignment Officer. The Assignment Officer maintains a master list of all of the job positions available at the Treatment Center and whether they are held by an inmate or resident.[28] According to the Plan, when there is a job vacancy, the Assignment Officer will post a notice in the Housing Units describing the responsibilities, hours, and pay for that position, together with a sign up sheet on which inmates and residents may sign up for the job. The Assignment Officer will then interview individuals and make a selection. When there is a vacancy for a position which was previously held by a resident, DOC's priority is to fill the job with another resident. While DOC maintains this is its practice, there is no written policy which provides that residents are entitled to receive priority. Superintendent Murphy acknowledges that it should be formally included in the written policy.

Some residents allege that DOC has engaged in job-splitting in order to create enough positions to accommodate the influx of inmates. For example, residents complain that a once five-day position has been split into two positions, a two-day and three-day, so that two people can have that job. Deputy Superintendent Spataro says that some job-splitting did occur to generate jobs for the new inmates because the Treatment Center budget for jobs initially stayed the same. Nevertheless, there are a wide variety of jobs available to and presently held by residents. Mr. Murphy says that while all permanent positions should be posted in accordance with the policy, he acknowledges that there was an occasion where a job previously held by an inmate was filled by an inmate without being posted. According to Murphy, this was a mistake which DOC subsequently remedied by creating a position for a resident.[29] At least one resident testified that he believes DOC complies with policy in posting all jobs which become available.

In addition, DOC recently instituted a new work policy which requires residents to participate in therapy in order to be able to take part in the work program.[30]

---

27. See "Roster of Educational and Vocational Classes, Winter 1999" (Ex. 9).

28. The Assignment Officer is required to maintain a monthly record of all of the inmates and residents who participate in the work program.

29. This event was recorded in the JRI staff member meeting notes of January 6, 1999.

The minutes state, "next job opening to be given to civil inmate."

30. This is per the recently revised DOC regulation, 103 DOC 450—"Institution Work Assignments", which became effective March 8, 1999. It specifically requires residents who wish to hold a work position to be "treatment compliant," as shown by an 80 percent participation rate in Primary Group. Partic-

The idea of tying treatment to work was contemplated on page 5 of the Plan under the section entitled "Program Goals and Summaries" which mentions "the development of methods to utilize preferential work program assignments as an incentive for treatment." Dr. Schwartz does not have any objection to this policy.

Of major concern to Dr. Schwartz was the introduction of 360 inmates into the Treatment Center. Since that time, she has observed policy changes relating to property, security and disciplinary procedures. In particular, there have been problems with delays, job assignments, and interrogations which are clearly reflected in the testimony of residents and staff. For example, many residents complain about the increased number of pat searches, strip searches, metal detector searches and random urinalysis testing that are conducted since the inmates arrived at the Treatment Center. Also attributed to the inmate presence is the increased interruptions to therapy classes on account of frequent drills now conducted at the Center. Some residents complain that their therapy time has been reduced by as much as twenty-five to fifty percent as a result of these drills. Nevertheless, Dr. Schwartz finds that the presence of inmates brings positive influences to the Center. She specifically notes the increased interaction which comes with the energy of a new group and the benefits of change for a group that had been resistant to change.

Dr. Schwartz recognized that one of the areas in need of improvement is the Community Access Program ("CAP"), and she has voiced her concerns to JRI and DOC. The CAP was conceptualized as part of a multi-phase community access program which allows residents who are ready for a less restrictive environment to transition from the medium security setting of the Treatment Center to a minimum security phase, then pre-release phase, and finally to reintegration into the community. Fifty-four pages of the Plan are devoted to the CAP. All witnesses agree that an important element of sex offender treatment is to have a community access program which offers controlled access to the community. Gradual reintegration is particularly important given that residents who have been at the Treatment Center for several years may be especially in need of help in readjusting to the community.

Ms. King who chairs the Community Access Center, outlined the annual review process that each resident undergoes to evaluate his sexual dangerousness status and assess his progress in treatment. She spoke at length about the CAP and acknowledged that there are no residents currently in the program and that no residents have applied to the program in the last year. She attributes this to several reasons, namely, that some residents are comfortable at the Center and do not wish to leave because they do not have families or homes to return to upon release; participation in the CAP is not required in order to participate in the Section 9 hearing process and have one's sexually dangerous label lifted; residents with criminal sentences pending are no longer eligible for the CAP;[31] and the sad reality that some residents suffer from a hopelessness and depression and do not wish to participate in the CAP.

While the CAP is more restrictive under the Plan than it was at one time, the Plan is responding to legislative changes, in addition to changes in the thinking about sex offenders. As the First Circuit has already remarked, CAP represents a "sensi-

---

ipation is monitored weekly by Treatment Teams. According to the regulation it is "the philosophy of the Massachusetts Treatment Center that the primary focus for all inmates/residents housed at the facility shall be directed first to treatment programs, and only

then to other activities, e.g. work, recreation, etc."

**31.** Based on the Legislature's enactment of Mass.Gen.Laws ch. 123A § 6A. *See Martel v. Fridovich,* 14 F.3d 1 (1st Cir.1993).

tive area of tension between safety and treatment, and between the individual and the community." *King,* 149 F.3d at 16. The Court acknowledged a shrinkage of numbers in the CAP and that a substantial number of residents refused to participate in treatment programs.[32] *Id.* However, the Court went on to say that this did not constitute any constitutional failure, given the background that "a substantial number of residents, many of whom are serving very lengthy sentences, simply refuse to participate in or apply to treatment programs." Having reviewed the CAP provisions and signaled its approval, the Court of Appeals went on to state that "whereas access to the community had earlier been approved prior to the designing of a program, careful, even meticulous, planning must now precede approval of access ... we cannot say that the CAP is not the least restrictive feasible response." *Id.*

A community access program is indispensable in a treatment program, but it is not functioning at the capacity it was hoped to at the Treatment Center today. As Mr. Canfield candidly acknowledged, there are difficulties in operating a sex offender treatment program in Massachusetts at this time. This acknowledgment is especially noteworthy because it underlines the challenge to DOC to operate the Treatment Center amidst a currently adverse political climate.

The Circuit Court also reviewed transfer procedures which allow DOC to transfer a resident who is still serving an unexpired criminal sentence to a correctional institution if the resident is unamenable to treatment, unwilling to follow a treatment program, or poses a danger to staff or residents.[33] The Court of Appeals concluded that the transfer policy contained adequate assurances of treatment in that an effort will be made to transfer the resident to an institution where sex offender treatment is available and that the statute requires DOC to make voluntary treatment services available. *King,* 149 F.3d at 18. There was no testimony at the hearing to indicate that this procedure was not being followed.

Dr. Schwartz testified that her work is not affected by the consent decrees and that she does not consult them in supervising treatment at the Center. Moreover, any concerns she has had about treatment she has shared with DOC and has received a satisfactory response. This news is further supported by the Circuit Court's opinion which stated that the transfer of dual control to exclusive DOC management, combined with the Plan "does not appear likely to undermine the Original Decree or to violate the Constitution." *King,* 149 F.3d at 19.

Both Mr. Canfield and Dr. Cusack also testified about their interaction with DOC. Both say that they have worked and are continuing to work with DOC to minimize interruptions and to set priorities for residents to benefit from pyschoeducational, avocational, and job programs. Despite the inevitable "mistake," both are satisfied with DOC's attitude and response towards them. While they acknowledge that things at the Treatment Center are not perfect, they believe that the overall atmosphere and relationship with DOC is positive. Moreover, the transfer of control from DMH to DOC has been helpful they say, because they have found it easier to deal with one agency as opposed to two.

Dr. Cusack does not believe that the presence of inmates is adversely affecting therapy. He supports the testimony that residents receive priority for psychoeducational classes and certain jobs. He believes that the programs are effective and

**32.** The Circuit Court acknowledged that in 1996, only 3 of the 91 eligible residents submitted applications and that as of January 1997, only 2 remained in the program and 12 remained in the Community Transition program.

**33.** Mr. Canfield drafted the Transition Program utilized since November 1992.

are improving. All in all, he believes that DOC and JRI are providing meaningful treatment. He is familiar with the Plan and believes that DOC has been complying with the Plan as it relates to providing therapy and treatment.

Of particular note was Mr. Canfield's testimony regarding the resignation of Mr. James Moody as Director of the Transition House.[34] Mr. Moody resigned because of what he considered to be DOC's indifference to the CAP. Mr. Canfield acknowledged the difficulties Mr. Moody encountered during the transfer of authority from DMH to DOC, but he split the blame between Mr. Moody and DOC. For example, Canfield refused to fire Mr. Moody at DOC's request, yet he felt that Mr. Moody had not performed well in his work with DOC. Compounding the situation, Mr Moody was reprimanded by DOC when he allowed a resident to make a personal call. Mr. Moody resented the inquiry and resigned. While Mr. Canfield would not have fired Mr. Moody, he was not satisfied with his performance and accepted the resignation.

In summary, the testimony of JRI officials shows a cooperative working relationship and an open line of communication with DOC and a willingness on the part of DOC to respond to concerns expressed by JRI personnel.

The testimony of the plaintiffs' expert, Dr. Theoharis Seghorn,[35] did little to change my assessment of JRI's capability. Dr. Seghorn experienced the Center while it was under the dual control of DMH and DOC. Dr. Seghorn described what the conditions were when he began work at the Center in 1977. Regarding the CAP, Dr. Seghorn estimated that between 1979 and 1984 there were several thousand individual trips made by residents into the community. Five or six DMH employees were available to escort residents into the community and estimated that ten to fifteen percent of the population participated in these escorted trips. In addition to trips into the community, some residents had their own car, established their own bank accounts and were allowed overnight stays away from the Treatment Center.

I accept Dr. Seghorn's views on the importance of a CAP to a treatment program, a view echoed by JRI as well, but he did not testify in light of the legislative constraints which exist on the CAP today. His testimony, overall, was favorable to JRI's programs, programs which remain in place under DOC management of the Center. Describing its work as "effective, highly professional, and state-of-the-art programming," he commended JRI for significant improvement, in "instituting the most valid treatment models available today," a system which "should serve as a national model for such programming." [36]

The most vital testimony in the course of this litigation has come from the residents themselves. Keeping that in mind, I have carefully reviewed the affidavits and testimony presented by the men who are civilly-committed to the Center. In addition, I have reviewed the hundreds of letters that I have received from residents over the years, which address a variety of issues having to do with the Treatment Center.

---

**34.** Mr. Moody is a licensed mental health counselor who worked at the Treatment Center from June 1993 until he resigned on October 6, 1996. He was hired by JRI as Program Manager of JRI's Transition Program. His job was to implement what is now referred to as the Community Access Program. He also led therapy sessions and taught psychoeducational classes. He resigned in protest over his belief that DOC was interfering with the CAP and that DOC lacked the "willingness, desire and ability to implement or manage a CAP." (Moody Aff. ¶ 4).

**35.** Dr. Seghorn is a licensed psychologist who was employed at the Center from 1977 to 1981 as Director of Clinical Services and from 1981–1986 as Assistant Administrator. He is now employed by New England Forensic Associates.

**36.** Letter dated March 7, 1997 from Dr. Seghorn to Gregory Canfield, JRI (Ex. 7).

Residents' complaints about the present conditions of the Treatment Center primarily concern MPU placement; the increased number of searches; the interruption of therapy due to drills and scheduled movements; the atmosphere at the Treatment Center since the introduction of inmates; and the effect that the presence of inmates has on classes, work opportunities, the maintenance of property, and the use of the library, gym, and recreation area.

Some of these concerns are reflected in the minutes of the weekly Treatment Advisory Board meetings.[37] Resident representatives attend these weekly meetings for the purpose of discussing treatment matters with Dr. Schwartz. Dr. Schwartz has relayed residents' concerns to DOC and some changes have resulted. For example, ever since a therapist was assaulted by an inmate, all therapy has been conducted within the sight and sound of a corrections officer. Doors to therapy rooms were left open, leaving the room visible to corrections officers, as well as other residents and inmates. Residents complained about how the presence of guards affected their therapy sessions and in particular, how it disturbed the confidentiality of the session. Under present policy, the doors are not ajar, but are closed to the deadbolt stop, so that while the "sight and sound" policy of DOC is maintained for security reasons, privacy is maintained for treatment purposes. According to Dr. Schwartz, therapy is better now because the staff feel safer. In another example, to reduce delays in getting to use the gym, DOC has scheduled movements for civils to begin a few minutes earlier than movements for inmates. This

also lessens the delay in getting other residents to their therapy sessions.

This court and the Court of Appeals have already examined many of the same types of criticisms leveled by residents about the management and operation of the Center. Citing residents' complaints about the amount of clothing, funds, telephone calls, room visits, stamps, etc., the First Circuit held that "the Plan justifies some reduction in these privileges because of past experiences with security, assault, gambling, coercion and interruptions in treatment," and that "[n]o reduction rises to the level of a constitutional infraction." *King*, 149 F.3d at 19.

To be sure, there are issues that arise in the day to day management of the Treatment Center. Funds are being sought from capital planning funds to install toilet facilities accessible to the yard to attempt to address the residents' complaint about the lack of toilet facilities in the yard. While this complaint was the subject of resident testimony, the records do not show any request by a resident for a special accommodation because of a urinary or other problem that may force an individual to defecate or urinate while in the yard.[38]

Moreover, there are differences between the rules governing residents and those governing inmates. For instance, there are differences in the policies which apply to residents and inmates regarding property and MPU placement (inmates have follow-up hearings before the Disciplinary Board while residents appear before the Behavior Review Committee). As previously mentioned, residents are allowed to begin their scheduled movements a few minutes before the inmates. This staggered movement has alleviated some of the

37. Minutes of the Treatment Advisory Board Meeting, May 29, 1997 discuss a perception by the new DOC inmates that they are better than the civilly committed residents ... because "they are labeled sexually dangerous and ... are considered very sick ... inmates are getting the message from some C.O.s and gym coaches to stay away." (Ex. 5). Minutes from the Senior Staff Meeting, February 8, 1999 state "Issue with inmates v. civils—con-

cerning the use of gym equipment. Mike Concaiceo to draft plan to alleviate the problem. Joe to submit plan to Superintendent by end of day." (Ex. 17).

38. This was also alleged in plaintiffs' Motion For Corrective Action as a basis for an Eighth Amendment violation.

delays in getting residents to therapy, the gym or other activities.

It is not all clear sailing, to say the least. Testimony from the residents shows that sessions *are* interrupted by mandatory drills, but efforts are made to schedule drills in the beginning of sessions so as to have minimum interruptions. Various searches are conducted, however, these are necessary for security reasons. The telephone system has failed on occasion and once a resident was not reached in time to receive important personal news from his family, a terribly unfortunate event. Again however, this was not described as a constant problem. Among residents' other complaints are that light bulbs are not replaced and carbon paper is not made available for purchase. Discipline is alleged to be erratic and unfair, and the assertion was made that a "mental watch" was applied in some cases as a means of keeping a resident in MPU detention. Residents also say that the release process is affected and hindered by an ineffective community access program and "roadblocks" put in the way of eligible. An independent letter from resident Eugene Rector deals with issues which he says were overlooked in testimony, but which I believe were covered adequately at the hearing, such as therapy time, interruptions, and work assignments.

The question is whether these complaints, taken in their totality, impair, or affect treatment so as to render it ineffective and, therefore, in violation of the statute and the consent decrees. I conclude they do not, considered in their totality, render treatment ineffective. Rather, I conclude that the treatment provided is effective and provided under the least restrictive conditions given all the circumstances that exist at the Treatment Center. I rely on the testimony summarized

above, my oversight over the years, my visits to the Center and most importantly, the Plan as the governing document of the Treatment Center. I repeat the comment of Judge Coffin that the Plan justifies some reduction in privileges for security reasons and that "[no] reduction rises to the level of a constitutional infraction." *King*, 149 F.3d at 19.[39]

The testimony of the residents, which I credit, shows two major problems confronting the Treatment Center, namely, the state of the Community Access Program and the influx of DOC inmates. A review of the CAP reveals that it is cumbersome and that it requires a maintained effort on a resident's part to complete each phase of the program. That being said, there is nothing in the record which specifically explains what, if any, "roadblocks" exist which hinder residents' participation in the CAP or otherwise demonstrate that the program is not accessible to them. Of course, there have been isolated instances where mistakes were made on the part of DOC. For instance, one resident testified that he had applied for and received approval from the Community Access Board to move to another phase in the CAP and was awaiting final approval from the Superintendent. According to the Plan, the Superintendent is required to act within fifteen days of the Board's issuance of its report. The Superintendent thus failed to follow the policy in this particular instance. However, there was nothing in the record which indicates that this is a repeated failing.

I recognize the validity of the circumstances which Ms. King says contributes to the low participation rate. Nevertheless, as all who testified agree, the CAP is an important component of the Treatment Center. Therefore, it needs attention in

---

**39.** It is, of course, true that the added emphasis on security and safety, together with a new approach to behavior management … will inevitably effect some retreat from a more permissive atmosphere. But appellants sweeping condemnation cannot stand without

more precise identification of serious defects in the many provisions regarding varieties of treatment, the extent of clinical supervision, and the safeguards of individual rights. *King*, 149 F.3d at 16.

such a way as to encourage and facilitate greater participation in the program so that residents receive the benefit of the program before being released to the public. This is not a problem which can be addressed by the micro-management of the federal court. The CAP policies set forth an adequate means for providing community access. We rely on the professional judgment of treatment providers to coordinate efforts with DOC to achieve greater participation.

Clearly, the presence of 360 DOC inmates, and the possibility that more will be sent to the Treatment Center as space becomes available has an effect and in some instances, an adverse affect. And I understand that there may be issues arising out of the administration of the Plan in the future if DOC becomes indifferent to its responsibilities both under the statute and the Plan to keep residents separate and apart from inmates. If ignored, the Plan will simply replace the consent decrees as the basis of future complaints and the parties will be destined for a future generation of litigation. At this point, however, I conclude that the Commonwealth has sustained its burden of demonstrating that the underlying conditions that existed when the decrees were entered have been remedied and that the Commonwealth has complied with the decrees in good faith since they were entered. I conclude further that, after considering the record of the past twenty-five years, the recent legislative enactments, and the potential for influence of political attitudes and economic forces in this complex and challenging area of law and administration, there is little or no likelihood that the Treatment Center will revert to an earlier time, nor that the constitutional violations will be repeated when the decree is lifted.

As this Circuit has said in an earlier opinion in this litigation:

> In institutional reform litigation, injunctions should not operate inviolate in perpetuity. *See Rufo v. Inmates of the Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 762–65, 116 L.Ed.2d 867 (1992); *Board of Educ. v. Dowell,* 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991); *see also Milk Wagon Drivers Union v. Meadowmoor Dairies, Inc.,* 312 U.S. 287, 298–99, 61 S.Ct. 552, 85 L.Ed. 836 (1941) (explaining that continuation of an injunction is justified only by continuation of the circumstances which induced it). This must mean that, notwithstanding the parties' silence or inertia, the district court is not doomed to some Sisyphean fate, bound forever to enforce and interpret a preexisting decree without occasionally pausing to question whether changing circumstances have rendered the decree unnecessary, outmoded, or even harmful to the public interest.[40]

Based on the full record, these consent decrees should be terminated. They no longer confer any benefit on the operation of the Treatment Center other than serving as a constant reminder of the federal court's presence for over twenty-five years. A telling point in Superintendent Murphy's testimony came when he was asked his basis of reference when he was considering a policy or procedure change and whether he considered the consent decree. In candor, he stated that he did not consider the consent decree but rather, he turned to the Plan and was guided by it. While this appears to be a most damning statement, upon reflection, I believe it is simply candid testimony that these twenty-five year old consent decrees are no longer the tools or rules of governance and are no longer necessary to the operation of a secure and effective Treatment

---

**40.** *In re Pearson,* 990 F.2d 653, 658 (1st Cir. 1993). *See also King,* 52 F.3d 1 (1st Cir. 1995), citing, *Mackin v. City of Boston,* 969 F.2d 1273, 1275 (1st Cir.1992) ("we believe that district courts should be flexible in considering requests for relaxation of, or release from, decrees which were initially established to bring about needed institutional reforms."), *cert. denied,* 506 U.S. 1078, 113 S.Ct. 1043, 122 L.Ed.2d 352 (1993).

Center. Effective treatment is offered; physical conditions have improved greatly; there are differing levels of security; meaningful work, education, and avocational programs; and discipline, including sequestration, conforms to acceptable standards of due process; all under the least restrictive conditions necessary to achieve the purposes of commitment, namely, the care, treatment, rehabilitation, and custody of sexually dangerous persons.

I believe the Management Plan is an enforceable operating document that recognizes the improvements made as a result of the consent decrees over the years and acknowledges DOC's responsibilities to manage the Treatment Center accordingly.

I recognize that residents will continue to voice their complaints about the circumstances of their existence at the Treatment Center. This decision does not preclude them from challenging events on the basis of constitutional or other protected rights. In the first place, residents may bring an action to enforce the terms of the existing Plan. Moreover, as the First Circuit stated in affirming a district court's decision to terminate another consent decree, plaintiffs remain "free to initiate a new round of proceedings designed to show that post-termination conditions actually do violate their federally protected rights." *Rouse*, 129 F.3d at 662. I remind the parties again today that any new allegations of unconstitutional conditions or treatment will be addressed in separate proceedings.

### IV.

■ An additional argument defendants advance is that the consent decrees must be terminated pursuant to the Prison Litigation Reform Act of 1995 ("PLRA"), 18 U.S.C. § 3626, amended by Pub.L. No. 105–119, § 1239(a)(2), 111 Stat. 2440, 2470 (1997). I address this argument in the interest of completing the record for the purposes of cross-appeals. Based on a reading of the statute itself, PLRA case law [41] and the case law that has developed around the Treatment Center, I find that the PLRA has no application to the consent decrees.

The PLRA reforms the federal courts' adjudicatory powers over prisoner-initiated civil litigation. Among its many provisions, the PLRA limits the power of district courts to grant prospective relief by declaring that "in any civil action with respect to prison conditions, a defendant or intervenor shall be entitled to the immediate termination of any prospective relief [42] if the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C.A. § 3626(b)(2). Such prospective relief shall not terminate, however, "if the court makes written findings based on the record that prospective relief remains necessary to correct a current or ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation." *Id.* § 3626(b)(3).

---

**41.** The constitutionality of the PLRA has been unsuccessfully challenged in several courts. The First Circuit recently upheld its constitutionality in *Inmates of Suffolk County Jail v. Rouse*, 129 F.3d 649 (1st Cir.1997). Congress is not finished with its drive to reform federal courts jurisdiction over prison litigation. H.R.3718, the Delay Amendment, provides that any consent decree in effect before PLRA's enactment "that provides for remedies relative to prison conditions shall cease to be effective on the date of the enactment of this Act." That bill is languishing in the Senate at this writing.

**42.** "Prospective relief" includes "all relief in any form that may be granted or approved by the court ... includ[ing] consent decrees." *Id.* § 3626(g)(7), (9). "Consent decree" is defined as "any relief entered by the court that is based in whole or in part upon the consent or acquiescence of the parties but does not include private settlements." *Id.* § 3626(g)(1).

As a matter of statutory interpretation, the PLRA does not extend to cover civilly-committed residents at the Treatment Center. In the first place, the Treatment Center is not a facility to which coverage of the PLRA extends. The PLRA applies only to persons who are subject to incarceration, detention or admission to "prisons" as defined by the statute. The PLRA defines "prisoner" as "any person subject to incarceration, detention, or admission to any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pre-trial release, or diversionary program." *Id.* § 3626(g)(3). "Prison" is defined as "any Federal, State, or local facility that incarcerates or detains juveniles or adults accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law." Id. § 3626(g)(5). Civilly-committed patients are not "prisoners," nor is the Treatment Center a "prison" within the meaning of the PLRA.

The applicability of the PLRA to the Treatment Center is an issue of first impression in this Circuit. However, other courts have addressed the issue and have concluded that the PLRA has no application. In a case which bears similar analysis to the Treatment Center, *West v. Macht*, 986 F.Supp. 1141 (W.D.Wis.1997),

the district court held that a person who was civilly-committed pursuant to Wisconsin's sexual predator law was not a "prisoner" within meaning of the PLRA. While the person had been convicted of a criminal violation, his current detention was not part of the punishment for that crime, but was instead a civil commitment imposed upon a judicial determination that he was a sexually violent person under Wisconsin law.[43]

Massachusetts courts have repeatedly stressed that the residents at the Treatment Center are there for treatment, not for punishment and that they were sent there as civilly-committed individuals, not as convicted criminals. Under M.G.L. ch. 123A, patients are committed for "treatment and rehabilitation" and not for punishment. *Commonwealth v. Page*, 339 Mass. 313, 318, 159 N.E.2d 82 (1959). Treatment Center case law is replete with instances that consistently refer to the non-punitive purpose of the facility.[44] Further, as noted above, at this writing there are eleven residents at the Center who were sent to the Treatment Center without ever receiving a criminal sentence. Of the remaining 165 residents, 89 have completed their criminal sentences and remain there solely on the basis of their civil commitment. Given the unique nature of

---

**43.** Wisconsin law, Chapter 980 authorizes "the civil commitment of persons, previously convicted of a sexually violent offense, who currently suffer from a mental disorder that predisposes them to repeat such acts."

**44.** *See Commonwealth v. Barboza*, 387 Mass. 105, 111, 438 N.E.2d 1064 (1982) ("Chapter 123A is a comprehensive legislative program designed to identify and treat sexually dangerous persons. The statute was enacted 'with the dual aims of protecting the public against future antisocial behavior by the offender, and of doing all that can be done to rehabilitate him.' *Commonwealth v. Rodriguez*, 376 Mass. 632, 646, 382 N.E.2d 725 (1978)."); *See also Commonwealth v. Major*, 354 Mass. 666, 668, 241 N.E.2d 822 (1968), *cert. denied*, 393 U.S. 1109, 89 S.Ct. 921, 21 L.Ed.2d 806 (1969) ("The statute ... does not intend punishment and does not in terms impose it, and nothing therein justifies punitive treatment or confine-

ment under any prison conditions, except such as are reasonably required for security ... Indeed, implicit in the statute and its purpose is the obligation to provide an environment conducive to a cure or an alleviation of the dangerous trait" (citations omitted)); *See also Gomes v. Gaughan*, 471 F.2d 794, 800 (1st Cir.1973) ("Both the Massachusetts court and legislature have made considerable effort to differentiate between the treatment of the sexually dangerous, on the one hand, and the penalizing of criminals on the other."); *See also In re Wyatt*, 428 Mass. 347, 351, 701 N.E.2d 337 (1998) and *In re Hill*, 422 Mass. 147, 153, 661 N.E.2d 1285, cert. denied, 519 U.S. 867, 117 S.Ct. 177, 136 L.Ed.2d 118 (1996) (affirming the notion that civil hearings held pursuant to c. 123A are not equivalent to proceedings that result in criminal sanctions, and therefore do not afford the same protections.)

the facility, the PLRA should not apply to the consent decrees governing Treatment Center operations.

It is for these reasons that I find that the PLRA does not apply to the Treatment Center and therefore provides no basis for terminating the consent decrees.

## V.

The Commonwealth has phrased its motion alternatively, to vacate or terminate the consent decrees. In *Rufo*, the defendants asked the district court to enter an order that vacated the consent decree. In that case, the district court decided to terminate, but not vacate, the decrees. As the district judge stated in that case, a consent decree is "an adjudication of an ongoing obligation based on a claim of 'violation of a Federal right' that was at least one part of the subject matter of the civil action in which the Consent Decree was entered. That adjudication may still have pragmatic consequences even after the prospective relief that had earlier been included in the Consent Decree has been terminated." *Rufo*, 952 F.Supp. at 883–84. The First Circuit upheld the trial court's decision to terminate, rather than vacate, the consent decrees, noting that the distinction between the terms has practical significance. "While terminating a consent decree strips it of future potency, the decree's past puissance is preserved and certain of its collateral effects may endure." *Rouse*, 129 F.3d at 662. I believe a record of the past should be preserved and, accordingly, I grant the motion to terminate the consent decrees. The *King* and *Williams* cases are to be closed by the Clerk.

*So Ordered.*