# United States Court of Appeals
## For the First Circuit

Nos. 13-1546
    13-1604
    13-1610

JEFFREY M. HEALEY; EDWARD GIVEN,

Plaintiffs - Appellees/Cross-Appellants,

JOEL PENTLARGE,

Plaintiff,

v.

LUIS S. SPENCER, in his official capacity as
Commissioner of Correction;
MASSACHUSETTS DEPARTMENT OF CORRECTION;
MICHAEL CORSINI, in his official capacity as
the Superintendent of the Massachusetts Treatment Center,

Defendants - Appellants/Cross-Appellees,

NATAYLIA PUSHKINA; DEBORAH O'DONNELL,

Defendants.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

---

Before

Torruella and Selya, Circuit Judges,
McAuliffe,* District Judge.

---

Mary P. Murray, Supervising Counsel, with whom Nancy Ankers

---

* Of the District of New Hampshire, sitting by designation.

White, Special Assistant Attorney General, and Brendan J. Frigault, Counsel, Massachusetts Treatment Center, were on brief, for appellants/cross-appellees.

John A. Houlihan, for appellee Healey, and Harry L. Miles, for appellee Given, with whom Hilary B. Dudley, Scott R. Magee, Kevin Kam, Edwards Wildman Palmer LLP, Green, Miles, Lipton, LLP, Eric Tennen, and Swomley & Tennen, LLP, were on brief, for appellees/cross-appellants.

---

August 26, 2014

---

**McAULIFFE, District Judge**.  Jeffrey Healey and Edward Given reside in the Massachusetts Treatment Center in Bridgewater, Massachusetts (the Treatment Center or Center).  Each has been civilly committed as a sexually dangerous person (SDP).  In separate suits, Healey and Given challenged the adequacy of sex offender treatment provided by the Center as well as the conditions of their confinement.  They sought equitable relief against the Massachusetts Department of Corrections, as well as the Commissioner of Correction and the Superintendent of the Treatment Center, in their official capacities (hereinafter referred to collectively as DOC).  The cases were consolidated.

Healey and Given alleged violations of the Constitution and state statutory provisions.  Healey also alleged that the DOC was not in compliance with the terms of its plan for the management of the Treatment Center — a management plan the DOC developed during the course of prior litigation.  Following a trial on the merits, the district court entered a final order granting plaintiffs declaratory and injunctive relief on some claims, but entered judgment in favor of the defendants on the remaining claims.  Both sides appeal from the district court's final judgment.  We affirm in part and reverse in part.

## I.  Background

Massachusetts law provides for the involuntary civil commitment of persons found to be sexually dangerous.  Mass. Gen. Laws ch. 123A, § 1 et seq.  Under Section 2 of the civil commitment statute, sexually dangerous persons may be placed in the Treatment Center, for "care, custody, treatment and rehabilitation."  Id. § 2.  Operational control of the Center is vested in the DOC.  Id. Each resident of the Center is permitted, by Section 9 of the statute, to annually petition the Massachusetts Superior Court for an examination and determination of whether he or she remains sexually dangerous.  Id. § 9.

An earlier version of the statute provided for shared control of the Treatment Center by the DOC and the Massachusetts Department of Mental Health (DMH).  In 1972, Treatment Center residents brought two lawsuits seeking to rectify a broad array of appalling conditions, as well as inadequacies in treatment, work opportunities, and avocational and educational activities at the Center.  See King v. Greenblatt (King I), 52 F.3d 1, 2 (1st Cir. 1995) and; Williams v. Lesiak, 822 F.2d 1223, 1224 (1st Cir. 1987). That litigation gave rise to nearly three decades of judicial oversight of the Treatment Center's operations.  The layered history of that long-running period of judicial supervision can be found in this Court's related decisions.  See, e.g., King v. Greenblatt (King II), 149 F.3d 9, 11-12 (1st Cir. 1998) (recounting

-4-

prior decisions); <u>In re Pearson</u>, 990 F.2d 653, 655 (1st Cir. 1993) (same); <u>Langton</u> v. <u>Johnston</u>, 928 F.2d 1206 (1st Cir. 1991).  During that period, substantial improvements in both the conditions of confinement and treatment protocols for Center residents were realized, and, in 1999, the relevant equitable decrees were finally terminated.  <u>See</u> <u>King</u> v. <u>Greenblatt</u> (<u>King III</u>), 53 F. Supp. 2d 117, 139 (D. Mass. 1999).  The general background that follows is necessarily a condensed version of that history, but one sufficient to illuminate the current issues.

In 1974, the district court entered two remedial consent decrees in <u>King</u> and one in <u>Williams</u>, the parties having agreed that the then prevailing conditions warranted judicial relief.  <u>See</u> <u>King III</u>, 53 F. Supp. 2d at 119.  (The cases were later consolidated. <u>Id.</u>)  Conditions at the Treatment Center at that time "were medieval — worse than those obtaining in the prison system," <u>Langton</u>, 928 F.2d at 1212, and included "cramped, poorly furnished cells" without toilets or sinks; a polluted and unsafe water supply; an "outmoded and sub-standard" sewerage system; obsolete heating and ventilation equipment which caused some cells to go unheated for days; a dearth of medical professionals; the absence of a library, educational programs, gymnasium, outdoor recreation area, work release or community access programs; and limited vocational facilities.  <u>King III</u>, 53 F. Supp. 2d at 119.  The consent decrees, which became known as the Original Decree and the

Supplemental Decree, "aimed to correct" those and other inadequacies. Id.[1]

The Original Decree provided that "patients at the Treatment Center should have the least restrictive conditions necessary to achieve the purposes of commitment." King II, 149 F.3d at 15 (internal quotation marks omitted). That provision, we noted in King II, was the Original Decree's "substantive essence." Id. The decree's more specific provisions required DMH and DOC to "take steps jointly to improve physical conditions, implement a meaningful work program, and have a system of differing security for different categories of patients . . . to permit less restrictive conditions for those patients not requiring maximum security." King III, 53 F. Supp. 2d at 120 (internal quotation marks omitted). Defendants were also required "to submit a plan for therapeutic, educational, vocational, and avocational programs at the Treatment Center," as well as for the short-term release of residents into the community.[2] Id. The Supplemental Decree prohibited the placement of Treatment Center residents into solitary confinement as punishment or for disciplinary purposes, and required all sequestration to meet "minimum standards of due

_____

[1] For simplicity's sake we refer to the Original Decrees in King III and Williams collectively as the Original Decree.

[2] That requirement was contained in the Original Williams Decree, but not in the Original King Decree. See King III, 53 F. Supp. 2d at 120.

process" and "human decency."  Id. (internal quotation marks omitted).

The decrees considered the Center a mental health facility, with primary responsibility over residents and their treatment vested in the Department of Mental Health.  The Department of Corrections, on the other hand, was responsible for providing a secure setting.  The DOC was expected to work collaboratively with DMH to carry out the decrees' requirements. Id. at 119-20.  The joint governance framework embodied in the decrees mimicked the division of control described in the statute, as it then existed.

For nearly two decades after entry of the consent decrees, "[t]he stream of [enforcement] litigation occasionally overflowed the district court," Pearson, 990 F.2d at 655, much of it occasioned by the conflicts inherent in DOC's and DMH's shared governance of the Center.[3]  Shared governance by statutory command came to an end in 1994, when the Massachusetts legislature transferred all operational control of the Treatment Center to the DOC.  See 1993 Mass. Acts ch. 489.  The Commonwealth then moved, under Fed. R. Civ. P. 60(b)(5), to modify the consent decrees to reflect that statutorily-directed change in governance.  The

_____

[3]  The Commonwealth abolished new civil commitments in 1990, but reinstated the practice nine years later.  The King III litigation (during that interim period) addressed conditions relative to persons civilly committed under the old law.

district court at first denied the motion to modify, "finding that DOC had not presented the Court with any information demonstrating its ability to provide treatment in compliance with the consent decrees." King III, 53 F. Supp. 2d at 121. The court "invited DOC to provide specific details in the form of a plan of how it proposed to operate the facility." Id. at 121-22. DOC, in response, developed and proffered a detailed management plan and, subsequently, an amended management plan (Plan).

Finding that the proffered Plan met the "goals of treatment and security and protection of residents' rights," the district court modified the outstanding decrees to reflect DOC's sole responsibility for the Treatment Center's operation. Id. at 122. The Original Decree's provisions governing the allocation of state agency responsibility were modified, and the Supplemental Decree's "general proscription of disciplinary and punishment procedures" was stricken, with solitary confinement "link[ed] . . . to the offense underlying the original commitment of the individual." King II, 149 F.3d at 19. The Commonwealth's alternative request — for outright vacation of the decrees — was denied, but without prejudice to its renewing that request after one year. King III, 53 F. Supp. 2d at 122.

In several related appeals from the district court's modification orders, this Court determined that the modifications passed muster under Rufo v. Inmates of Suffolk Cnty. Jail, 502 U.S.

367 (1992). See King II, 149 F.3d at 19, 22. Rufo requires institutional consent decree modifications to be grounded on a "'significant change' in either factual conditions or in law" and "'suitably tailored to the changed circumstance.'" King I, 52 F.3d at 4 (quoting Rufo, 502 U.S. at 383). We held that the state statutory amendment constituted a significant change in law impacting the Original Decree's terms regarding the division of control between DMH and DOC, id. at 6, and that factual circumstances had changed sufficiently to warrant modification of the Supplemental Decree's "general proscription of disciplinary and punishment procedures." King II, 149 F.3d at 19, 22.

Addressing Rufo's second prong, we anticipatorily scrutinized the DOC's Plan, id. at 15, and determined, based on that review, that the change in Treatment Center governance did not "appear likely to undermine the Original Decree or to violate the Constitution." Id. at 19. Importantly, in making that determination, we emphasized that the Plan itself did not constitute a modification of the Original Decree, but represented, instead, the "ways in which DOC aspire[d] to fulfill the requirements of the Original Decree." Id. at 15. Just as the "policies and practices that [had] been relied on in the past by DMH" constituted that agency's response to its obligation under the decree "to achieve effective treatment under the least restrictive conditions," the Plan represented the DOC's own proposed means of

achieving the same goal.  Id.  We also held, upon review of the Plan's provisions regarding "clinical treatment programs and procedural safeguards," and its specifications for a disciplinary system, that the modifications to the Supplemental Decree were suitably tailored to the changed circumstances.  Id. at 22.

Within a year of this Court's decision in King II, the Commonwealth again filed a motion to vacate or, in the alternative, to terminate the consent decrees.  King III, 53 F. Supp. 2d at 123. After full discovery and a hearing, the district court granted the motion to terminate the decrees and closed the King III and Williams cases.  Id. at 139.

In a thorough decision, the district court (Mazzone, J.) correctly identified and applied the relevant legal standards, as described in Bd. of Educ. v. Dowell, 498 U.S. 237 (1991).  And, after considering a voluminous record that included testimony of Treatment Center professionals and residents, Plan provisions, and the DOC's record of implementing those provisions, the court found that "the underlying conditions that existed when the decrees were entered have been remedied and that the Commonwealth has complied with the decrees in good faith since they were entered."  King III, 53 F. Supp. 2d at 136.  "The evidence," the court determined, "clearly shows that the consent decrees have served the purpose of correcting those conditions and are no longer necessary to maintain those improvements."  Id. at 125.  Judge Mazzone further concluded

-10-

that "there is little or no likelihood that the Treatment Center will revert to an earlier time, nor that the constitutional violations will be repeated when the decree is lifted." Id. at 136. Satisfied that the preconditions to decree termination were met, Judge Mazzone terminated the decrees. Id. at 139.

In a preface to his findings, Judge Mazzone acknowledged that "there may be issues arising out of the administration of the Plan in the future if DOC becomes indifferent to its responsibilities both under the statute and the Plan to keep residents separate and apart from inmates." Id. at 136. He suggested that, "[i]f ignored, the Plan will simply replace the consent decrees as the basis of future complaints and the parties will be destined for a future generation of litigation." Id. He found, nevertheless, that "the Commonwealth has sustained its burden of demonstrating" that the preconditions to termination of the decrees had been met and specifically concluded that "these consent decrees should be terminated." Id.

In an epilogue to his findings, Judge Mazzone offered the following commentary which, for comprehensiveness and context, we repeat in its entirety:

> *I believe the Management Plan is an enforceable operating document* that recognizes the improvements made as a result of the consent decrees over the years and acknowledges DOC's responsibilities to manage the Treatment Center accordingly.

> I recognize that residents will continue to voice their complaints about the circumstances of their existence at the Treatment Center. This decision does not preclude them from challenging events on the basis of constitutional or other protected rights. In the first place, *residents may bring an action to enforce the terms of the existing Plan.* Moreover, as the First Circuit stated in affirming a district court's decision to terminate another consent decree, plaintiffs remain "free to initiate a new round of proceedings designed to show that post-termination conditions actually do violate their federally protected rights." Rouse, 129 F.3d at 662. I remind the parties again today that any new allegations of unconstitutional conditions or treatment will be addressed in separate proceedings.

Id. at 137 (emphasis added).

Two years after the consent decrees were terminated, Healey brought this suit challenging both the conditions of his confinement at the Treatment Center and the adequacy of his sexual offender treatment. In 2005, Healey's case was consolidated with a similar suit in which Given was later joined as plaintiff.[4] Both Healey and Given alleged violations of various constitutional rights. Healey also alleged that the DOC was in violation of numerous provisions of the Plan. Arguing that the Plan constitutes a settlement agreement, Healey alleged a breach of contract by the DOC and, contending that the Plan amounts to an enforceable court

---

[4] In 2005, Healey's suit was consolidated with a case brought in 2004 by then-resident Joel Pentlarge. Given was joined as a plaintiff in Pentlarge's suit in 2006. Pentlarge dropped his request for monetary damages and was dismissed from the suit upon his release from the Treatment Center in 2006.

-12-

order, he alleged that Plan violations can be remedied in the context of contempt proceedings. Both Healey and Given sought permanent injunctive relief on their own behalf; no class was certified.

The district court (Gertner, J.) determined that the Plan was not properly construed as an enforceable settlement agreement. But, relying on Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 380-81 (1994), it held that the Plan was enforceable as a court order. Under Kokkonen, a federal court retains subject matter jurisdiction to enforce a settlement agreement if the dismissal order incorporates the terms of the agreement or if the court retains jurisdiction to enforce it. Id. at 381. The district court determined that Judge Mazzone had "effectively incorporated the Plan into [his] order allowing the termination of the consent decrees," such that the Plan acquired the character of a court order over which the court retained continuing jurisdiction to enforce. Central to the district court's reasoning was its apparent conclusion that Judge Mazzone's termination of the consent decrees was conditional on the Plan's having attained the status of an enforceable injunctive order.[5]

_____

[5] The district court's reasoning is found in Magistrate Judge Dein's report and recommendation, which was adopted by Judge Gertner. Chief Judge Saris later declined to revisit the issue, reasoning that Judge Gertner's earlier resolution was controlling, as "law of the case." Healey v. Murphy, Nos. 01-11099, 04-30177, 2013 WL 1336786, at *14 (D. Mass. Mar. 29, 2013).

After additional dispositive rulings, Judge Gertner presided over a ten-day bench trial on the remaining claims, which included Healey and Given's claims that the DOC's failure to provide adequate treatment violated their Fourteenth Amendment substantive due process rights; claims for violations of several other constitutional provisions; and Healey's claim that the DOC was in violation of numerous Plan requirements. While post-trial mediation proceedings were being conducted, Judge Gertner retired. The case was reassigned to Chief Judge Saris who presided over a second, shorter, trial. See Fed. R. Civ. P. 63 (describing the procedure when one judge replaces another before the completion of a trial). After the second trial, Chief Judge Saris issued a Memorandum and Order and Final Judgment and Order.

The district court entered judgment for the DOC on most of Healey's claims, but ruled that the DOC violated some of its obligations under the Plan, as well as Healey's substantive due process rights, by failing to provide adequate pharmacological evaluation and treatment. Healey, 2013 WL 1336786, at *19. The district court further held that the DOC violated both Plan and state statutory requirements (but not Healey's due process rights) by failing to provide a functioning Community Access Program (CAP). See id. at *28. The district court found in favor of Given only on his claim that the DOC violated his substantive due process rights

by failing to provide adequate pharmacological evaluation and treatment.  See id. at *19.

The district court ordered the DOC to "have Healey and Given evaluated by a qualified psychiatrist and, if appropriate, provide them pharmacological treatment." Id. at *47.  The district court declined to afford injunctive relief to Healey with respect to his CAP claim, because his "persistent behavioral problems" rendered him ineligible for the program.  Id. at *46.  The court, did, however, enter a broad injunction requiring the DOC to "meet the requirements of the Amended Management Plan in all material respects." Id. at *47.

The DOC appeals the declaratory judgment in favor of Healey on his claim that it violated its obligations under the Plan and failed to provide adequate pharmacological evaluation and treatment.  The DOC also challenges the district court's injunction to the extent it recognizes the Plan as an enforceable court order, and requires compliance with its provisions.  For his part, Healey also appeals from the injunction compelling DOC's compliance with the Plan, arguing that the district court should have required more, and erred in not finding additional Plan violations.  Healey and Given both challenge the district court's determinations that the DOC, in several respects, did not violate their constitutional rights, including its determination that the DOC's failure to provide a functioning Community Access Program does not violate

their constitutional right to due process.  Neither side has challenged the district court's determination that the Constitution requires the defendants to offer the plaintiffs adequate pharmacological evaluation and treatment.

## II.  Standard of Review

We review the district court's grant of permanent injunctive relief for abuse of discretion. Asociacion de Educacion Privada de P.R., Inc. v. Garcia-Padilla, 490 F.3d 1, 8 (1st Cir. 2007).  Factual findings are reviewed for clear error and questions of law de novo.  Id.  The district court's rulings regarding the constitutionality of the conditions of confinement at the Center and the adequacy of its sex-offender treatment program present mixed questions of law and fact which might not sit neatly at either end of the review spectrum.  "An inquiry into whether current [institutional] conditions constitute an ongoing violation of a federal right 'comprises a mixed question of fact and law, the answer to which we review along a degree-of-deference continuum, ranging from plenary review for law-dominated questions to clear-error review for fact-dominated questions.'" Morales Feliciano v. Rullan, 378 F.3d 42, 52-53 (1st Cir. 2004) (quoting Inmates of Suffolk Cnty. Jail v. Rouse, 129 F.3d 649, 661 (1st Cir. 1997)). Here, we need not decide where, precisely, on the continuum our review of the district court's constitutional determinations should fall for, "even under the more appellant-friendly lens of de novo

-16-

review," Healey and Given's "claim[s] of error [are] unavailing." United States v. Gonzalez, 736 F.3d 40, 42 (1st Cir. 2013).

### III.  Discussion

To issue a permanent injunction, the district court must find that: "(1) plaintiffs prevail on the merits; (2) plaintiffs would suffer irreparable injury in the absence of injunctive relief; (3) the harm to plaintiffs would outweigh the harm the defendant would suffer from the imposition of an injunction; and (4) the public interest would not be adversely affected by an injunction."  Garcia-Padilla, 490 F.3d at 8.

Although the parties devote considerable attention to the element of irreparable harm, this case can be resolved by answering two basic questions that relate to the merits.  The first question is whether the Plan is an enforceable court order.  That question, which we answer in the negative, is necessary to Healey's contempt claim and central to both the DOC's accountability for its failure to follow Plan provisions and Healey's claim that the district court did not do enough to enforce the Plan.  The second question, broadly speaking, is whether, as Healey and Given argue, the district court erred in not finding additional constitutional violations.

-17-

## A.  Plan Violations

The district court's construction of the Plan as, effectively, an enforceable court order, is in error.  An order enforceable on pain of contempt, as the district court construed the Plan to be, is an injunction.  See Int'l Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n, 389 U.S. 64, 75 (1967) ("[A]n equitable decree compelling obedience under the threat of contempt . . . [is] an 'order granting an injunction.'") (quoting Fed. R. Civ. P. 65(d)).  The Plan, however, was clearly not offered as a proposed decree meant to be substituted for the existing consent decrees that were being terminated.  Indeed, the Plan was never entered as an order, and certainly not an order that was consistent with the requirements of Fed. R. Civ. P. 65(d).[6]  Moreover, Judge Mazzone did not, either expressly or impliedly, condition termination of the existing consent decrees on the Plan's status as an enforceable injunction, as plaintiffs contend.

---

[6]  Rule 65(d) governs the "[c]ontents and [s]cope of [e]very [i]njunction," clearly providing that "[e]very order granting an injunction . . . must . . . state its terms specifically . . . and . . . describe in reasonable detail — and not by referring to the complaint or other document — the act or acts sought to be restrained or required."  Fed. R. Civ. P. 65(d).  These requirements "are not 'mere[ly] technical' but are 'designed to prevent uncertainty and confusion . . . and to avoid' basing a 'contempt citation on a decree too vague to be understood.'"  NBA Props., Inc. v. Gold, 895 F.2d 30, 32 (1st Cir. 1990) (quoting Schmidt v. Lessard, 414 U.S. 473, 476 (1974) (per curiam)).  Accordingly, "[t]o be enforceable in contempt, an injunctive decree must satisfy" Rule 65(d)'s "specificity requirements."  Burke v. Guiney, 700 F.2d 767, 769 (1st Cir. 1983).

In his final decision, Judge Mazzone commented pointedly and forcefully about his hope for, and expectations of, the Plan. His comments, upon which Given and Healey heavily rely, that "I believe the Plan is an enforceable operating document" and that "[i]n the first place, residents may bring an action to enforce the terms of the existing plan," are at best ambiguous in context. But even broadly construed, these passing comments simply cannot provide the necessary positive command of an order "compelling obedience under the threat of contempt," particularly when they were made in the course and context of terminating consent decrees that mandated essentially identical legal obligations. Int'l Longshoreman's Ass'n, 389 U.S. at 75.[7]

The critical point, however, is that Judge Mazzone did precisely what he intended to do — we perceive no misstep on his part. The highly respected judge was fully capable and experienced; he knew how to issue an injunction and how to make it stick. Viewing his decision in the full context of this decades-old litigation, it is plain to us that Judge Mazzone dissolved the existing consent decrees, while simultaneously exhorting the DOC not to regress, to continue to implement the Plan as the right thing to do, and to recognize that failure to maintain the then-

---

[7] The comment is best understood as a general prediction, to the effect that should the Commonwealth revert to prior unacceptable practices, the Plan's terms would likely serve as a solid blueprint for future injunctive relief.

acceptable conditions would surely result in yet additional costly, disruptive, and likely successful litigation. As judicial oversight of the DOC's operation of the Treatment Center came to an end, the judge's comments were meant to counsel, not dictate. Acknowledging federalism's demand that judicial oversight not continue in perpetuity, Judge Mazzone considered the record evidence, applied the proper legal standards, and correctly concluded that the time had arrived to terminate judicial supervision. King III, 53 F. Supp. 2d at 124-25, 136. Terminating the decrees, he remarked, removed from the DOC's operations "a constant reminder of the federal court's presence." Id. at 136.

The Plan was important, of course. It supplied the assurance of continuing constitutionally acceptable conditions necessary to support the court's termination of the decrees. Because the unconstitutional conditions had been remedied, assurances of future adequacy had been given and found credible, and the consent decrees had outlived their usefulness, the judge's path to termination was well-marked. See Freeman v. Pitts, 503 U.S. 467, 489 (1992) ("We have said that the court's end purpose must be to remedy the violation and, in addition, to restore state and local authorities to the control of a school system that is operating in compliance with the Constitution.")

The Plan cannot plausibly be characterized as a replacement consent decree. A consent decree is both a settlement

-20-

and an injunction.  Aronov v. Napolitano, 562 F.3d 84, 91 (1st Cir. 2009).  For the reasons given, the Plan is not an enforceable injunction.  In any event, Judge Mazzone's future-looking reference to the Plan "replac[ing] the consent decrees" can hardly be thought to mean that the consent decrees were being swapped-out for the Plan, as an injunction.  The issue for decision was whether court supervision, through enforcement of the consent decrees, should be terminated.  Terminating the consent orders only to simultaneously replace them with virtually coextensive Plan provisions, as an injunctive order, would have merely maintained the status quo. Judge Mazzone of course did not intend to continue judicial supervision of the Center.

The Supreme Court also has cautioned that a district court must be explicit if it wishes to retain jurisdiction to enforce the terms of a settlement agreement by, for example, incorporating the terms of the settlement agreement into its final order.  See Kokkonen, 511 U.S. at 381.  Judge Mazzone's order, read in toto, does not by any stretch of the imagination explicitly retain continuing jurisdiction over the matter.  In point of fact, it gives the opposite impression.  By the same token, the order does not incorporate the terms of the Plan.

All of this is not to say that Judge Mazzone's comments about the Plan's role as an operating document served no purpose. The end of judicial oversight in institutional reform cases often

brings with it appropriate judicial warnings cautioning defendants to avoid future repetition of past violations.  It seems to us that Judge Mazzone's comments fell comfortably within that commendable tradition.  See, e.g., People Who Care v. Rockford Bd. of Educ. Sch. Dist. 205, 246 F.3d 1073, 1078 (7th Cir. 2001) (Posner, J.) ("It should go without saying that if the board takes advantage of its new freedom from federal judicial control to discriminate against minority students in violation of federal law, it will expose itself to a new and draconian round of litigation.  We trust that $238 million later, it has learned its lesson."); Tasby v. Moses, 265 F. Supp. 2d 757, 781 (N.D. Tex. 2003) ("[T]he [School] District must adhere to the Covenants and Commitments adopted by the Board and relied on by the Court in reaching its decision today."); Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist., 237 F. Supp. 2d 988, 1089 (E.D. Ark. 2002) ("As a final caveat, I want to caution the Board that it must be careful in how it uses its newly restored wings.  Just as Icarus could not resist the temptation to fly too close to the sun, causing his waxen wings to melt, the Board must keep the Constitution in sight at all times in making future decisions regarding the operation of the Little Rock school system.  Otherwise, LRSD will find itself embroiled in another round of costly litigation, with the possibility of still more court supervision and monitoring.  I do not want this, and I assume LRSD does not."), aff'd 359 F.3d 957 (8th Cir. 2004).

Healey argues, in the alternative, that even if the Plan is not the equivalent of an enforceable order, still, the DOC should be judicially estopped from denying its enforceability.  He says that the position the DOC currently takes — that it is not judicially bound by the Plan — is inconsistent with litigation positions it has taken in the past.  The argument is not persuasive.

"'[T]he doctrine of judicial estoppel prevents a litigant from pressing a claim that is inconsistent with a position taken by that litigant either in a prior legal proceeding or in an earlier phase of the same legal proceeding.'" Alt. Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 32-33 (1st Cir. 2004) (quoting InterGen N.V. v. Grina, 344 F.3d 134, 144 (1st Cir. 2003)).  The doctrine is "judge-made" and is "designed to protect the integrity of the judicial system." Perry v. Blum, 629 F.3d 1, 10 (1st Cir. 2010) (citing New Hampshire v. Maine, 532 U.S. 742, 749 (2001)).  Although its "contours . . . are hazy" and "its elements cannot be reduced to a scientifically precise formula, . . . courts generally require the presence of three things before introducing the doctrine into a particular case." Id. at 8-9.  First, the "earlier and later positions must be clearly inconsistent," id. at 9, "that is, mutually exclusive." Alternative Sys. Concepts, 374 F.3d at 33.  "Second, the party must have succeeded in persuading a court to accept the earlier position." Perry, 629 F.3d at 9.  Lastly,

-23-

"the party seeking to assert the inconsistent position must stand to derive an unfair advantage if the new position is accepted by the court."  Id.

Healey identifies two prior DOC positions that, he says, directly contradict the DOC's current position.  He points first to the fact that the DOC presented the Plan to the King III court, as its then current and future strategy for running the Treatment Center, in support of its motions to modify and terminate the consent decrees.  Healey implies (but does not argue explicitly) that, by doing so, the DOC represented to the court that it was undertaking the obligation, under pain of contempt, to implement the Plan, presumably indefinitely into the future.  Healey also contends that, following termination of the decrees in 1999, the DOC repeatedly put forth arguments, including in this case, that hinge on Treatment Center residents being bound by the Plan. Although the DOC purportedly took that position "repeatedly," Healey gives only one such example.  In the district court, the DOC moved to dismiss the constitutional claims.  It argued that those claims are barred by res judicata on grounds that Judge Mazzone had implicitly found that the Plan did not violate any state or federal rights.

The minimum prerequisites for judicial estoppel have not been met here.  The DOC's prior positions are not "directly inconsistent" with the position it takes now.  As we have already

noted, at the consent decree modification stage in <u>King III</u> the Plan served the evidentiary purpose of providing assurance to the court that the shift to sole control of the Center by the DOC would not undermine the decrees' provisions. At the decree termination stage, the DOC, like most defendants seeking release from institutional reform decrees, did not commit to follow its Plan indefinitely under threat of contempt, but instead offered the Plan as evidence of compliance with its outstanding legal obligations, and as assurance that it was unlikely to revert to its old unconstitutional ways once the decrees were lifted.

The DOC's res judicata argument in the court below is, likewise, not directly contradictory to its position here. The argument that Treatment Center residents are bound by (purported) judicial determinations regarding the Plan's constitutionality is not inconsistent with a subsequent position that the DOC is not bound, on pain of contempt, to follow the Plan. The two positions relate to very different issues and are obviously not mutually exclusive.

For these reasons, we hold that the Plan is not, and was not meant by Judge Mazzone to be, an enforceable court order. Healey is not, therefore, entitled to declaratory or injunctive relief based on Plan violations. We, necessarily, reverse the district court's declaratory judgment in favor of Healey on his claim that DOC is in contempt of court for failing to comply with

provisions of the Plan.  We also necessarily reverse the district court's affirmative injunction requiring DOC to "meet the requirements of the Amended Management Plan in all material respects."  Healey, 2013 WL 1336786, at *47.

**B.  Constitutional Violations**

Healey and Given also challenge the district court's determination that conditions at the Center (other than inadequate pharmacological treatment) do not violate their due process rights under the Fourteenth Amendment.  We find no error.

Civilly committed sexually dangerous persons are entitled to conditions of confinement that comport with minimum Fourteenth Amendment due process standards.  Cote v. Murphy, 152 Fed. Appx. 6, 7 (1st Cir. 2005) (per curiam) (citing Seling v. Young, 531 U.S. 250, 265 (2001)).  Even if no single condition runs afoul of constitutional protections, still, a combination of conditions may violate a resident's due process rights.  See id. (noting that double bunking is not per se unconstitutional, but that condition could violate due process if "combined with other adverse conditions").  Disagreeable conditions can, however, be consistent with the demands of due process, so long as they do not amount to punishment.  That is, so long as they "'bear some reasonable relation to the purpose[s] for which persons are committed.'"  Id. (alterations in original) (quoting Seling, 531 U.S. at 265).  As noted earlier, under the Commonwealth's statute, commitments to the

-26-

Treatment Center are made for the purpose of providing for the "care, custody, treatment and rehabilitation" of those found to be sexually dangerous to the community. Mass. Gen. Laws ch. 123A § 2. We have stressed that these statutory purposes encompass "not only treatment and rehabilitation but public safety." Cote, 152 Fed. App'x at 7; see also Miller v. Dukakis, 961 F.2d 7, 9 (1st Cir. 1992) ("[P]lacement at the Treatment Center [is] intended, at least in part, to protect society.")

When challenging the treatment provided as constitutionally inadequate, civilly committed persons must show that "the defendant failed to exercise a reasonable professional judgment." Battista v. Clarke, 645 F.3d 449, 453 (1st Cir. 2011). "States enjoy wide latitude in developing treatment regimens," Kansas v. Hendricks, 521 U.S. 346, 368 n.5 (1997), and "there can be more than one reasonable judgment." Battista, 645 F.3d at 453 (citing Youngberg v. Romeo, 457 U.S. 307, 321 (1982)).

The district court thoroughly reviewed the DOC's sex offender treatment program. It examined the qualifications of professionals involved in developing the program, the steps taken by those professionals to keep the program current with evolving practices in the field, and the DOC's implementation of the program. It found that the treatment program is based on "considerable research in the field," Healey, 2013 WL 1336786, at *12, and is at the "cutting edge of cognitive behavioral therapy

-27-

for sex offenders," id. at *30. While acknowledging some problems, such as the DOC's failure to collect important data and assess "the efficacy of the . . . program," the court nevertheless concluded that the program "is in accordance with best professional judgment and does not violate . . . the Constitution." Id.

We have recognized that the DOC confronts "legitimate security concerns," Langton v. Johnston, 928 F.2d at 1216, in its operation of the Treatment Center because, by definition under the state statute, every resident of the Center has committed sexual crimes and has been found by a court, beyond a reasonable doubt, to suffer from a mental condition that renders him likely to reoffend. See Mass. Gen. Laws ch. 123A § 1 (defining an SDP). We have also recognized that the interest in safety within the Treatment Center itself may be critical to the delivery of adequate treatment. See Langton, 928 F.2d at 1220 n.17 ("[A]n unsafe environment would be one in which the ability to deliver effective therapeutic services would be drastically reduced."). A court inquiring into the conditions under which sexually dangerous persons are confined must "accord[] wide-ranging deference" to the judgment of facility administrators as to what is "needed to preserve internal order and discipline and to maintain institutional security." Bell v. Wolfish, 441 U.S. 520, 521 (1979) (prison context).

The district court did find that there is no functioning community access program at the Treatment Center in contravention

of applicable state law and the Plan.  But it also determined, correctly, that such a program is not constitutionally required. The district court pointed out that plaintiffs "submitted no expert testimony or professional standards stating that civilly committed sex offenders must have a community access program," and that they had not "explained why a meaningful treatment program using the . . . model of therapy" employed at the Center, "combined with the section 9 release process is not constitutionally sufficient." Healey, 2013 WL 1336786, at *28.

Healey and Given do not challenge the district court's factual findings, but argue that it failed to consider conditions at the Treatment Center in combination.  They point to conditions which, they say, when considered as a whole, create an environment that is not reasonably related to the purposes of commitment, especially rehabilitation (i.e., the lack of a treatment program "calculated to ready Residents for release into the community within a reasonable time"; the absence of a meaningful community access program; and a punitive level of security).

In assessing prevailing conditions at the Treatment Center, the district court applied the relevant due process standards and accorded appropriate deference to administrators with respect to safety issues.  After visiting the Treatment Center and thoroughly reviewing the relevant evidence, the district judge concluded that, with the exception of inadequate pharmacological

treatment, conditions at the Center do not violate Healey or Given's substantive due process rights.

The court reviewed aspects of the physical conditions of confinement at the Center and found that, among other things, the DOC's telephone restrictions, property restrictions, use of shackles when transporting residents outside the Center, elimination of room visits, and system of privileges all address legitimate security concerns. It concluded, therefore, that those conditions, either alone or in combination, do not violate residents' rights to due process.

Having thoroughly reviewed the district court's decision and the pertinent record, we discern no error. The district court recognized and correctly applied the relevant legal standards, and it expressly acknowledged that "[a]lthough . . . conditions may not state a due process claim when considered individually, [they could] when taken together." The court carefully considered all the evidence, made extensive factual findings, and meticulously applied the appropriate legal standards. It is clear to us that the district judge assessed the conditions both individually and in combination. The unchallenged factual findings fully support the district court's determination that, apart from inadequate pharmacological treatment, conditions at the Treatment Center do not offend Healey and Given's substantive due process rights.

## IV. Conclusion

We affirm in part and reverse in part the district court's final judgment and order. The declaratory judgment in favor of Healey on his contempt claim (Count I), as well as injunctive relief compelling the Commonwealth's compliance with the Plan's provisions, are reversed. The district court's judgment for the plaintiffs regarding the constitutionality of the pharmacological evaluation and treatment provided by defendants was not challenged on appeal and, thus, survives without regard to the proceedings before us. The district court's judgment in favor of defendants in all other respects is affirmed. The parties shall bear their own costs.